STEPTOE & JOHNSON LLP
Jeffrey M. Reisner (State Bar No. 143715)
jreisner@steptoe.com
Kerri A. Lyman (State Bar No. 241615)
klyman@steptoe.com
Joshua R. Taylor (admitted *pro hac vice*)
jrtaylor@steptoe.com
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 439-9423
Facsimile:  (213) 439-9599

Attorneys for the Chapter 11 Debtor and Debtor in Possession

THEODORA ORINGHER
William N. Lobel (State Bar No. 93202)
wlobel@tocounsel.com
535 Anton Blvd
Ninth Floor
Costa Mesa, CA 92626
Telephone: 714-549-6200

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## LOS ANGELES DIVISION

In re

KFIR GAVRIELI,

      Debtor and Debtor In Possession.

Case No. 2:21-bk-10826-BB

Chapter 11 Case

**SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Disclosure Statement Hearing
Date:  June 16, 2021
Time: 11:00 a.m. (Pacific Time)
Place: 255 E. Temple Street
      Los Angeles, California 90012
      Judge:  Hon. Sheri Bluebond

**IMPORTANT INFORMATION FOR YOU TO READ**

*THE DEADLINE TO VOTE ON THE DEBTOR'S FIRST AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (AS MAY BE AMENDED OR MODIFIED, THE "PLAN") IS _____ ____, 2021 AT _:00 __.M. PREVAILING CALIFORNIA TIME (THE "VOTING DEADLINE").*

*FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BEFORE THE VOTING DEADLINE AS DESCRIBED HEREIN.*

Kfir Gavrieli, an individual in the United States (the "Debtor" or "Kfir"), as debtor and debtor in possession, in the above-captioned chapter 11 case pending in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court"), is providing you with the information in this first amended disclosure statement with respect to the Plan (as may be amended or modified, the "Disclosure Statement") because you may be a creditor entitled to vote on the Plan.[1]

The Debtor believes that the Plan is in the best interests of his creditors. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. A summary of the voting instructions is set forth in Article I.B of this Disclosure Statement and in the order approving, among other things, the Disclosure Statement [ECF No. ____] (the "Disclosure Statement Order"). More detailed instructions are contained on the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be properly completed in accordance with the voting instructions on the ballot and **actually received** by the STEPTOE & JOHNSON LLP, 633 West Fifth Street, Suite 1900 Los Angeles, California 90071, Attn: Kerri Lyman; Joshua Taylor, Jeffrey Reisner, regular mail, overnight courier, or personal delivery at the appropriate address, by the Voting Deadline.

---

[1] Except as otherwise set forth herein, capitalized terms used in this Disclosure Statement but not defined herein have the meanings used in the Plan. Unless otherwise indicated, all amounts in this Disclosure Statement are reflected in U.S. dollars.

The effectiveness of the Plan is subject to material conditions precedent. *See* Article IV.N below entitled "Conditions Precedent to Confirmation and the Effective Date" and Article X of the Plan. There is no assurance that these conditions will be satisfied or waived.

This Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan. Debtor has not authorized any person to give any information or to make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes attached hereto or incorporated by reference or referred to herein. If given or made, such information or representation may not be relied upon as having been authorized by Debtor. The delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

**ALL CREDITORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN ATTACHED AS EXHIBIT A, THE PLAN SUPPLEMENT, AND THE RISK FACTORS DESCRIBED IN ARTICLE VI BELOW, BEFORE SUBMITTING BALLOTS IN RESPONSE TO THIS SOLICITATION.**

**ARTICLE XI OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, WHICH ARE DISCUSSED IN ARTICLE IV.M OF THIS DISCLOSURE STATEMENT. YOU SHOULD REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE IT MAY AFFECT YOUR RIGHTS.**

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, or between the Plan Supplement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, Debtor will file all Plan

Doc # DC/19510608v1

1  Supplement documents with the Bankruptcy Court no later than five (5) days before the Voting

2  Deadline or such later date as the Bankruptcy Court may approve.

3       This Disclosure Statement contains, among other things, descriptions and summaries of

4  provisions of the Plan. Debtor reserves the right to amend or modify the Plan consistent with

5  section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

6       The statements contained in this Disclosure Statement are made only as of the date of this

7  Disclosure Statement, and there can be no assurance that the statements contained herein will be

8  correct at any time after this date. The information contained in this Disclosure Statement,

9  including the information regarding the background of Debtor and his businesses and the

10 financial and valuation information regarding Debtor and his businesses is included for purposes

11 of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is

12 not to be construed as an admission or stipulation, but rather as a statement made in settlement

13 negotiations as part of Debtor's attempt to settle and resolve claims and controversies pursuant

14 to the Plan. The information contained in this Disclosure Statement will not be admissible in any

15 non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities,

16 or other legal effects of the Plan as to holders of Allowed claims against either the Debtor or the

17 Debtor as reorganized under the Plan, and any successor thereto on or after the Effective Date

18 (the "Reorganized Debtor"). Except where specifically noted, the financial information contained

19 in this Disclosure Statement and in its exhibits has not been audited by a certified public

20 accountant and has not been prepared in accordance with generally accepted accounting

21 principles in the United States.

22                **FORWARD-LOOKING STATEMENTS**

23       This Disclosure Statement contains "Forward-Looking Statements." All statements

24 (other than statements of historical facts) included in this Disclosure Statement regarding

25 operations, financial position, plans, investments, and business strategy of Debtor, may constitute

26 forward-looking statements. Forward-looking statements generally can be identified by the use

27 of forward-looking terminology such as "may," "will," "expect," "intend," "estimate,"

28 "anticipate," "believe," or "continue" or the negative thereof or variations thereon or similar

terminology. Although the expectations reflected in such forward-looking statements are believed by Debtor to be reasonable at this time, Debtor can give no assurance that such expectations will prove to have been correct. Important factors that could cause actual results to differ materially from such expectations are disclosed in Article VI of this Disclosure Statement, including, without limitation, in conjunction with the forward-looking statements included in this Disclosure Statement under the heading "Certain Risk Factors to be Considered." All subsequent written and oral forward-looking statements attributable to Debtor or persons acting on his or their behalf are qualified in their entirety by these cautionary statements.

Although stated with particularity, the liquidation analysis included in the "Liquidation Analysis" attached as **Exhibit B** of this Disclosure Statement are based on a variety of estimates and assumptions. Such estimates and assumptions are considered reasonable by Debtor, although they may prove to have been incorrect or unfounded; further, they are inherently subject to significant economic, competitive, tax, and other uncertainties, many if not most of which are beyond the control of the Debtor. There can be no assurance that the results will be realized, and actual results may vary materially and adversely from those projected.

**This Disclosure Statement has been prepared in accordance with section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and not necessarily in accordance with federal or state securities laws or other non-bankruptcy laws. This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.**

### QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or Debtor's chapter 11 case generally, please contact STEPTOE & JOHNSON LLP, 633 West Fifth Street, Suite 1900 Los Angeles, California 90071, Attn:    Kerri Lyman; Joshua Taylor, Jeffrey Reisner, via e-mail correspondence to

Doc # DC/19510608v1

klyman@steptoe.com; jrtaylor@steptoe.com; jreisner@steptoe.com (please reference "KG-Chapter 11" in the subject line).

Doc #  DC/19510608v1

# TABLE OF CONTENTS

**Page Nos.**

I. INTRODUCTION ................................................................................................... 1

    A.    Material Terms of the Plan ...................................................................... 2

    B.    Voting on the Plan ................................................................................. 15

        1.    Parties Entitled to Vote on the Plan ......................................... 15

        2.    Solicitation Package .................................................................. 18

        3.    Voting Procedures, Ballots, and Voting Deadline ..................... 19

    C.    Confirmation Hearing and Deadline for Objections to Confirmation ................. 20

    D.    Professionals and Advisors ................................................................... 21

II. GENERAL INFORMATION .............................................................................. 22

    A.    Debtor's Background ............................................................................. 22

        1.    The Company ............................................................................ 22

        2.    Charitable Work ........................................................................ 25

        3.    Litigation regarding the Company ............................................ 26

    B.    Debtor's Assets ...................................................................................... 27

        1.    The Company ............................................................................ 27

        2.    Debtor's Investments ................................................................ 28

        3.    Cash, Bank Accounts, Tax Refunds, Loans .............................. 31

        4.    Other Assets ............................................................................. 32

    C.    Debtor's Liabilities ............................................................................... 32

    D.    Reasons for Bankruptcy Filing ............................................................. 33

    E.    Funding of the Plan ............................................................................... 34

    F.    Backstop ................................................................................................ 35

III. THE CHAPTER 11 CASE ................................................................................ 36

    A.    Voluntary Petition ................................................................................. 36

    B.    Retention of Advisors for the Debtor .................................................... 36

    C.    The Creditors' Committee ..................................................................... 37

Doc #  DC/19510608v1

D.    Claims Process and Bar Date .................................................................. 37

E.    Adversary Proceedings ........................................................................... 38

IV. THE PLAN ........................................................................................................ 44

A.    Classification and Treatment of Claims Under the Plan......................... 45

B.    Acceptance or Rejection of the Plan; Effect of Rejection of Plan ......... 47

C.    Plan Distributions................................................................................... 47

D.    Sources of Cash for Plan Distributions .................................................. 48

E.    Preservation of Claims and Rights to Settle Claims .............................. 49

F.    Procedures for Resolving Disputed Claims ........................................... 50

G.    Executory Contracts and Unexpired Leases .......................................... 52

H.    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment.
54

I.    Discharge, Release, Injunctive, and Exculpatory Provisions of the Plan ............ 54

    1.    Discharge of Claims.................................................................... 54

    2.    Releases....................................................................................... 55

        a.    Releases by the Debtor ..................................................... 57

        b.    Releases by Holders of General Unsecured Claims, Judgment Claims
        and Secured Claims........................................................... 59

    3.    Exculpation and Limitation of Liability .................................... 61

    4.    Injunctions................................................................................... 62

        a.    General ............................................................................. 62

        b.    Injunction Against Interference With the Plan.................. 63

J.    Conditions Precedent to Confirmation and the Effective Date............................ 63

V. CERTAIN RISK FACTORS TO BE CONSIDERED .......................................... 64

A.    Risks Related to the Plan ........................................................................ 65

B.    Risks Related to the Company................................................................. 68

C.    Risks Related to the Investments ............................................................ 69

VI. CONFIRMATION OF THE PLAN ................................................................... 70

Doc # DC/19510608v1

A.    Voting Procedures and Solicitation of Votes.......................................................... 70

B.    Confirmation Hearing ............................................................................................... 70

C.    General Requirements of Section 1129 .................................................................... 70

      1.    Requirements of Section 1129(a) of the Bankruptcy Code ...................... 70

            a.    General Requirements ......................................................................... 70

            b.    Best Interests Test .............................................................................. 71

            c.    Feasibility of the Plan......................................................................... 72

      2.    Requirements of Section 1129(b) of the Bankruptcy Code ...................... 73

            a.    No Unfair Discrimination.................................................................... 73

            a.    Fair and Equitable Test....................................................................... 74

      3.    b. Confirmation of an Individual Chapter 11 Plan.................................. 75

            a.    Section 1129(a)(15) of the Bankruptcy Code..................................... 75

            b.    Section 1141(d)(5)(A) of the Bankruptcy Code................................. 76

VII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN..... 77

VIII. CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE

PLAN 78

      1.    Federal Income Tax Consequences to Holders of Claims ........................ 79

      2.    Certain Tax Consequences to Debtor's Estate.......................................... 80

      3.    Importance of Obtaining Professional Tax Assistance............................. 81

IX. CONCLUSION................................................................................................................ 81

Doc #  DC/19510608v1

**TABLE OF CONTENTS**
**(Continued)**

**EXHIBITS**

**Exhibit A**        **Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code**

**Exhibit B**        **Liquidation Analysis**

**Exhibit C**        **Financial Projections**

**Exhibit D**        **Disposable Income**

**Exhibit E**        **Plan Backstop**

Case 2:21-bk-10826-BB    Doc 308    Filed 06/01/21    Entered 06/01/21 09:47:52    Desc
Main Document    Page 11 of 95

# I.

## INTRODUCTION

Debtor submits this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") in connection with the solicitation of acceptances of the Plan. A copy of the Plan is attached as **Exhibit A**. **Please note that to the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.**

The Plan provides for the reorganization of Debtor under chapter 11 of the Bankruptcy Code. Under the Plan, Debtor is proposing to satisfy his debts by making payments to his creditors over 5 years to satisfy each debt in full with Interest at the Applicable Interest Rate (either the relevant contractual interest rate or statutory tax rate or if there is no contractual interest rate or statutory tax rate, the Federal Judgment Rate) or by turning over the Collateral securing their claims.  Debtor will make these payments from income, distributions and/or the sale of investments he holds. A summary of those investments is set forth herein in Article II.C. Pursuant to the Plan, subject to the specific terms set forth in the Plan:

- holders of Allowed Administrative Expense Claims, Priority Tax Claims, and Priority Non-Tax Claims, are paid in full either on the Effective Date or over a period of time;

- holders of Allowed Secured Claims will either receive the Collateral securing the respective Allowed Secured Claim or be paid in full with payments over five [5] years with Interest at the Applicable Interest Rate from the Petition Date until the earlier to occur of the final disposition of the Collateral or the last scheduled plan payment.

- holders of Allowed Unsecured Judgment Claims will be paid in full with payments over five [5] years with Interest at the Applicable Interest Rate from the Petition Date;

- holders of Allowed General Unsecured Claims will be paid in full with payments over five [5] years with Interest at their Applicable Interest Rate from the Petition Date; and

- the Debtor and holders of Allowed Claims release certain Persons and Entities.

**In addition, the Plan includes certain release, injunctive, and exculpatory provisions described in greater detail below. Please note that the Debtor will seek a discharge pursuant to section 1141(d)(5) of the Bankruptcy Code as of the Discharge Date of the Plan.**

This Disclosure Statement sets forth certain information regarding Debtor. This Disclosure Statement also describes the terms and provisions of the Plan, including certain effects

Doc # DC/19510608v1

of confirmation of the Plan, certain risk factors, the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

On _____, 2021, the Bankruptcy Court entered an order approving this Disclosure Statement as containing "adequate information," *i.e.*, information of a kind and in sufficient detail to enable a hypothetical reasonable investor typical of the holders of claims to make an informed judgment about the Plan. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

**A.    Material Terms of the Plan**

DEBTOR BELIEVES THAT THE IMPLEMENTATION OF THE PLAN IS IN THE BEST INTERESTS OF DEBTOR AND HIS CREDITORS. FOR ALL OF THE REASONS DESCRIBED IN THIS DISCLOSURE STATEMENT, DEBTOR URGES YOU TO RETURN YOUR BALLOT ACCEPTING THE PLAN BY THE VOTING DEADLINE (I.E., THE DATE BY WHICH YOUR BALLOT MUST BE ACTUALLY RECEIVED), WHICH IS _____, 2021, AT __:00 _.M. (PREVAILING CALIFORNIA TIME).

The following table summarizes the material terms of the Plan. For a complete description of the Plan, please refer to the discussion in Article IV of this Disclosure Statement entitled "The Plan" and the Plan itself:

| Treatment of Certain Claims | As further detailed in the Plan, the Plan contemplates the following treatment of certain claims: |
|---|---|
| | • Administrative Expense Claims – Except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Case, or the holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, and except as provided in Article 2.2, each holder of an Allowed Administrative Expense Claim against the Debtor shall receive, in full and complete settlement, release, and discharge of such Administrative Expense Claim, Cash equal to the unpaid amount of such Administrative Expense Claim on the latest of (i) five (5) Business Days after the Effective Date or as soon thereafter as reasonably practicable; (ii) if such Administrative Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which such |

Doc # DC/19510608v1

Administrative Expense Claim becomes Allowed, or as soon as reasonably practicable thereafter; (iii) the date on which such Administrative Expense Claim becomes due and payable in the ordinary course in accordance with the terms and subject to the conditions of any agreements or understandings governing, or other documents relating to, such Administrative Expense Claim; and (iv) such other date as may be agreed to by such holder and the Debtor or Reorganized Debtor.  **These claims are unclassified under the Plan and <u>are not</u> entitled to vote**.

- <u>Priority Tax Claims</u> – (a) <u>Treatment -</u> Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Debtor, one of the following treatments: (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim within the later of (a) five (5) Business Days after the Effective Date or as soon thereafter as reasonably practicable or (b) if such Priority Tax Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which such Priority Tax Claim becomes Allowed, or as soon as reasonably practicable thereafter; (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim with Interest at the Applicable Interest Rate from the Petition Date payable in installments on the Semi-Annual Distribution Dates in an amount equal to the Semi-Annual Priority Tax Amount, provided that if the Allowed Priority Tax Claim is not paid in full after application of the Semi-Annual Priority Tax Amount distributable on the fourth Semi-Annual Distribution Date, an additional distribution shall be made on the fourth Semi-Annual Distribution Date in an amount equal to the remaining amount owed on account of the Allowed Priority Tax Claim, or (iii) such other treatment as may be agreed upon by such Holder and the Debtor or otherwise determined upon an order of the Bankruptcy Court. The Debtor shall have the right, in his sole discretion, to pay any Allowed Priority Tax Claim or any remaining balance of any Allowed Priority Tax Claim (together with accrued but unpaid interest) in full at any time on or after the Effective Date without premium or penalty. For the avoidance of doubt, to the extent that any Claims by the Internal Revenue Service ("IRS") are related to amounts to be paid pursuant to the OVDP or the associated liabilities to the FTB, those Claims will receive priority in payment as specified in section 507(a)(8) of the Bankruptcy Code and be

treated as Priority Tax Claims in accordance with this Article 2.3.  To the extent that the IRS or FTB setoff any tax refund or other amounts owed to the Debtor against the Priority Tax Claim or otherwise receive a deposit or payment on account of the Debtor's obligations to the IRS or FTB, such amounts shall be applied against the next distribution(s) that would otherwise be payable to the IRS or FTB.

- (B) <u>OVDP Program</u> Debtor is currently participating in the IRS Offshore Voluntary Disclosure Program ("OVDP"). Following finalization of the OVDP with the IRS, the Debtor will file amended returns with the FTB making adjustments on Debtor's California tax returns consistent with the federal changes.   To the extent that amounts owed to the IRS and FTB on account of such Allowed Priority Tax Claims have not been determined by the date when the first distribution under the Plan would otherwise be due, the Debtor shall make a deposit, to each Holder of such Allowed Priority Tax Claim based upon a liability to the IRS and FTB in the collective amount of $14 million ("deposit amount"), in the proportion of 83.17:16.83, respectively until there has been a final determination of liability to such Holder of a Priority Tax Claim, with respect to which this deposit amount does not serve as a cap nor a floor. Notwithstanding the foregoing or anything to the contrary herein, the Debtor reserves all rights to object to any claim filed by the IRS or the FTB, including all rights to contest the amount owed to the IRS and/or the FTB.   To the extent that the IRS or FTB set off any tax refund or other amounts owed to the Debtor against the Priority Tax Claim or otherwise receive a deposit or payment on account of the Debtor's obligations to the IRS or FTB, such amounts shall reduce the remaining amount owed with respect to such Priority Tax Claim and shall be applied against the next distribution(s) that would otherwise be payable to the IRS or FTB and shall be offset and reduce the subsequent Semi-Annual Priority Tax Amount(s) that would otherwise be paid on subsequent Semi-Annual Distribution Date(s) on a dollar for dollar basis.  **These claims are unclassified under the Plan and <u>are not</u> entitled to vote**.

- <u>Priority Non-Tax Claims</u> – Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Priority Non-Tax Claim shall receive, at the option of the Debtor and in full and complete settlement, release, and discharge of, and in exchange for, such Priority Non-Tax Claim (i) payment in full in Cash, or (ii) other treatment rendering such Priority Non-Tax Claim

Doc #  DC/19510608v1

Unimpaired. Any Allowed Class 1 Claim not due and owing on the Effective Date shall be paid in full, in Cash, when it becomes due and owing. **These claims are <u>Unimpaired</u> under the Plan and <u>are not</u> entitled to vote**.

- Secured Claims – Classes 2A to 2G consists of all Secured Claims. Each Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for the purposes of classification, voting and receiving Plan Distributions. Classes 2A to 2G shall be treated as set forth below. Classes 2A to 2G are Impaired and are entitled to vote to accept or reject the Plan. Each holder of a Secured Claim shall retain any Liens it has until it receives the full value of such Allowed Secured Claim, in accordance with the terms of the Bankruptcy Code. **These claims are <u>Impaired</u> under the Plan and <u>are</u> entitled to vote.**

    o  Class 2A consists of the Secured Claim held by Jason Fung. Except to the extent that a holder of an Allowed Class 2A Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Class 2A Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Secured Claim, at the option of the Debtor, (i) the Collateral securing the Allowed Class 2A Claim, or (ii) Cash in ten (10) equal semi-annual payments of principal and interest, on each Semi-Annual Distribution Date, computed on the amount of the value of the Allowed Secured Claim plus Interest at the Applicable Interest Rate from the Petition Date until the sooner of final disposition of the Collateral or the tenth semi-annual payment. The Holder of an Allowed Class 2A Claim shall retain all Liens on assets that secure such Allowed Class 2A Claim until such Holder receives the full value of the Allowed Class 2A Claim plus Interest at the Applicable Interest Rate. **This claim is <u>Impaired</u> under the Plan and <u>is</u> entitled to vote.**

    o  Class 2B consists of the Secured Claim held by Ravi Sarin. Except to the extent that a holder of an Allowed Class 2B Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Class 2B Claim shall receive, in full and complete

Doc #  DC/19510608v1

settlement, release, and discharge of, and in exchange, for such Secured Claim, at the option of the Debtor, (i) the Collateral securing the Allowed Class 2B Claim, or (ii) Cash in ten (10) equal semi-annual payments of principal and interest, on each Semi-Annual Distribution Date, computed on the amount of the value of the Allowed Secured Claim plus Interest at the Applicable Interest Rate from the Petition Date until the sooner of final disposition of the Collateral or the tenth semi-annual payment.  The Holder of an Allowed Class 2B Claim shall retain all Liens on assets that secure such Allowed Class 2B Claim until such Holder receives the full value of the Allowed Class 2B Claim plus Interest at the Applicable Interest Rate. **This claim is <u>Impaired</u> under the Plan and <u>is</u> entitled to vote.**

o   Class 2C consists of the Secured Claim held by Sonia Yu.  Except to the extent that a holder of an Allowed Class 2C Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Class 2C Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Secured Claim, at the option of the Debtor, (i) the Collateral securing the Allowed Class 2C Claim, or (ii) Cash in ten (10) equal semi-annual payments of principal and interest, on each Semi-Annual Distribution Date, computed on the amount of the value of the Allowed Secured Claim plus Interest at the Applicable Interest Rate from the Petition Date until the sooner of final disposition of the Collateral or the tenth semi-annual payment.  The Holder of an Allowed Class 2C Claim shall retain all Liens on assets that secure such Allowed Class 2C Claim until such Holder receives the full value of the Allowed Class 2C Claim plus Interest at the Applicable Interest Rate. **This claim is <u>Impaired</u> under the Plan and <u>is</u> entitled to vote.**

o   Subject to the Plan Election, Class 2D consists of the Allowed Secured Judgment Claim held by Dikla Unatin. To the extent that any portion of the Judgment Claim held by Dikla Unatin is not a Secured Claim, the Judgment Claim held by Dikla Unatin shall be treated as a Class 3A Unsecured

Judgment Claim.  Subject to the Plan Election, except to the extent that a holder of an Allowed Class 2D Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Class 2D Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Secured Claim, the Collateral securing the Allowed Class 2D Claim.  The Holder of an Allowed Class 2D Claim shall retain all Liens on assets that secure such Allowed Class 2D Claim until such Holder receives the Collateral securing such Allowed Secured Class 2D Claim.  **This claim is <u>Unimpaired</u> under the Plan and <u>is not</u> entitled to vote.**

o   Subject to the Plan Election, Class 2E consists of the Allowed Secured Judgment Claim held by Dean Unatin. To the extent that any portion of the Judgment Claim held by Dean Unatin is not a Secured Claim, the Judgment Claim held by Dean Unatin shall be treated as a Class 3A Unsecured Judgment Claim. Subject to the Plan Election, except to the extent that a holder of an Allowed Class 2E Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Class 2E Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Secured Claim, the Collateral securing the Allowed Class 2E Claim.  The Holder of an Allowed Class 2E Claim shall retain all Liens on assets that secure such Allowed Class 2E Claim until such Holder receives the Collateral securing such Allowed Secured Class 2E Claim. **This claim is <u>Unimpaired</u> under the Plan and <u>is not</u> entitled to vote.**

o   Classes 2F consists of the Secured Claim held by Casa Hermosa, LLC.  Except to the extent that a holder of an Allowed Class 2F Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Class 2F Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Secured Claim, at the option of the Debtor, (i) the Collateral securing the Allowed Class 2F Claim, (ii) all Cash generated by

the Collateral securing such Allowed Class 2F Claim, or (iii) Cash on the final disposition of the collateral securing such Allowed Class 2F Claim, until paid the full value of the Allowed Class 2F Claim plus Interest at the Applicable Interest Rate from the Petition Date. If not paid in full sooner, all principal and interest unpaid on Claim 2F shall be due and payable on December 31, 2027. The Holder of an Allowed Class 2F Claim shall retain all Liens on assets that secure such Allowed Class 2F Claim until paid the full value of the Allowed Class 2F Claim plus Interest at the Applicable Interest Rate. The Class 2F Claim is non-recourse and shall not receive any payments from the Debtor or the Reorganized Debtor other than on account of the collateral (including the disposition of such collateral) securing such Allowed Class 2F Claim. **This claim is <u>Impaired</u> under the Plan and <u>is</u> entitled to vote.**

o   Class 2G consists of any Secured Claim that is not a Secured Claim in Classes 2A, 2B, 2C, 2D, 2E, or 2F. Except to the extent that a holder of an Allowed Class 2G Claim agrees to less favorable treatment, on the Effective Date or as soon thereafter as practicable, each holder of an Allowed Class 2G Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Secured Claim, at the option of the Debtor, (i) the Collateral securing the Allowed Class 2G Claim, or (ii) Cash in ten (10) equal semi-annual payments of principal and interest, on each Semi-Annual Distribution Date, computed on the amount of the value of the Allowed Secured Claim plus Interest at the Applicable Interest Rate from the Petition Date until the sooner of final disposition of the Collateral or the tenth semi-annual payment. The Holder of an Allowed Class 2G Claim shall retain all Liens on assets that secure such Allowed Class 2G Claim until such Holder receives the full value of the Allowed Class 2G Claim plus Interest at the Applicable Interest Rate. **These claims are <u>Impaired</u> under the Plan and <u>are</u> entitled to vote.**

•   <u>Unsecured Claims.</u> Classes 3A and 3B consist of all Unsecured Claims. Claims in Class 3B arise from consensual agreements and ongoing relationships which the Debtor requires be maintained for his future business and investments. Unlike the

Class 3B claims, the Class 3A claims arise from a judgment and there is not an ongoing consensual relationship that the Debtor needs to maintain to continue his business and investments.

- o **Class 3A - Unsecured Judgment Claims** – Subject to the Plan Election, Class 3A consists of all Unsecured Judgment Claims.  Subject to the Plan Election, except to the extent that a holder of an Allowed Unsecured Judgment Claim agrees to less favorable treatment, each holder of an Allowed Unsecured Judgment Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Allowed Unsecured Judgment Claim, its Unsecured Pro Rata Share of the Semi-Annual Unsecured Amount, if any, on each Semi-Annual Distribution Date, in Cash payments of principal and interest,  computed on the amount of the value of the Allowed Unsecured Judgment Claim plus Interest at the Applicable Interest Rate from the Petition Date until such Holder receives the full value of the Allowed Unsecured Judgment Claim plus Interest at the Applicable Interest Rate.  If an Allowed Unsecured Judgment Claim is not paid in full after application of the Unsecured Pro Rata Share of the Semi-Annual Unsecured Amount distributable on the tenth Semi-Annual Distribution Date, an additional distribution shall be made on the tenth Semi-Annual Distribution Date in an amount equal to the remaining amount owed on account of the Allowed Unsecured Judgment Claim.  **These claims are Impaired under the Plan and are entitled to vote**.

- o **Class 3B - General Unsecured Claims** – Class 3B consists of all General Unsecured Claims.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive, in full and complete settlement, release, and discharge of, and in exchange, for such Allowed General Unsecured Claim, its Unsecured Pro Rata Share of the Semi-Annual Unsecured Amount, if any, on each Semi-Annual Distribution Date, in Cash payments of principal and interest,  computed on the amount of the value of the Allowed General Unsecured Claim plus Interest at the Applicable Interest Rate from

the Petition Date until such Holder receives the full value of the Allowed General Unsecured Claim plus Interest at the Applicable Interest Rate. If an Allowed General Unsecured Claim is not paid in full after application of the Unsecured Pro Rata Share of the Semi-Annual Unsecured Amount distributable on the tenth Semi-Annual Distribution Date, an additional distribution shall be made on the tenth Semi-Annual Distribution Date in an amount equal to the remaining amount owed on account of the Allowed General Unsecured Claim. **These claims are <u>Impaired</u> under the Plan and <u>are</u> entitled to vote.**

- Plan Election.  Dikla Unatin and Dean Unatin shall have the option to elect ("Plan Election") one of the following three Plan options (each a "Plan Option" and collectively, the "Plan Options") on or prior to the Voting Deadline.  Both Dikla Unatin and Dean Unatin must together make the Plan Election and must choose the same Plan Option, or both shall be deemed to have rejected the Plan Election.  To the extent a Plan Election is made on or prior to the Voting Deadline, all claims of Dikla Unatin and Dean Unatin shall receive the treatment set forth in this Article 4.4 of the Plan and shall not receive the treatment set above in Articles 4.2 and 4.3, including with respect to the treatment set forth above with respect to Classes 2D, 2E, and 3A, except as explicitly provided for in Article 4.4 of the Plan.
  - Plan Option 1: If a Plan Election is made for Plan Option 1, the Judgment Claims of Dikla Unatin and Dean Unatin shall be treated as set forth above with respect to Classes 2D, 2E, and 3A, as applicable. Debtor shall obtain financing ("Plan Option 1 Backstop") in the amount of $17.5 million, to backstop sufficient funds for the payment of the Allowed Judgment Claims arising from the State Court Litigation in accordance with the terms of this Plan.  All rights of the Debtor with respect to such Judgment Claims, including Debtor's right to pursue his appeal of the State Court Litigation, preserved. Additionally, the Company shall be sold pursuant to the Sale Procedures.  The Plan Option 1 Backstop shall only be used to make distributions with respect to the Judgment Claims arising from the State Court Litigation and shall not be used to pay any other Claims.

Doc # DC/19510608v1

o   Plan Option 2: Plan Option 2 involves a sale of the company and resolution of the Adversary Proceeding.  If a Plan Election is made for Plan Option 2, (i) the Adversary Proceeding will be dismissed with prejudice and Dikla Unatin and Dean Unatin shall have no Claims arising from the Adversary Proceeding, (ii) Dikla Unatin and Dean Unatin shall retain their Judgment Claims arising from the State Court Litigation (as it relates to (ii) only, the "Plan Option 2 Claims"), with all rights of the Debtor with respect to such Judgment Claims, including Debtor's right to pursue his appeal of the State Court Litigation, preserved, (iii) the Debtor and Committee shall be deemed to waive all subordination claims they may possess with respect to the Plan Option 2 Claims under 11 U.S.C. § 510(b) or equitable subordination principles, and (iv) within thirty (30) days of a Final Order in the State Court Litigation with respect to the final amount of the Plan Option 2 Claims, the Allowed Plan Option 2 Claims will be paid in full in Cash. Debtor shall obtain financing ("Plan Option 2 Backstop") in the amount of $17.5 million, to backstop sufficient funds for the payment of the Plan Option 2 Claims.  Additionally, the Company shall be sold pursuant to the Sale Procedures.  The Plan Option 2 Backstop shall only be used to make distributions with respect to Allowed Plan Option 2 Claims and shall not be used to pay any other Claims.

o   Plan Option 3: Plan Option 3 involves a sale of the company, resolution of the Adversary Proceeding, Debtor's purchase of Dikla Unatin's interest in the funds held in certain Hong Kong Accounts, and a distribution from the Company to Dikla Unatin.

If a Plan Election is made for Plan Option 3, (i) the Adversary Proceeding will be dismissed with prejudice and Dikla Unatin and Dean Unatin shall have no Claims arising from the Adversary Proceeding, (ii) Dikla Unatin and Dean Unatin shall retain their Judgment Claims arising from the State Court Litigation (as it relates to (ii) the "Plan Option 3 Claims"), with all rights of the Debtor with respect to such Judgment Claims, including Debtor's right to pursue his appeal of the State Court Litigation, preserved, (iii) the Debtor and

11

Committee shall be deemed to waive all subordination claims they may possess with respect to the Plan Option 3 Claims under 11 U.S.C. § 510(b) or equitable subordination principles, and (iv) within thirty (30) days of a Final Order in the State Court Litigation with respect to the final amount of the Plan Option 3 Claims, the Plan Option 3 Claims will be paid in full in Cash. Debtor shall obtain financing ("Plan Option 3 Backstop") in the amount of $17.5 million, to backstop sufficient funds for the payment of the Plan Option 3 Claims. The Plan Option 3 Backstop shall only be used to make distributions with respect to Allowed Plan Option 3 Claims and shall not be used to pay any other Claims. Additionally, on the Effective Date, Debtor shall pay Dikla Unatin $4 million in exchange for all of her interest in, and shall release all claims with respect to funds held in the Hong Kong Accounts. Ms. Unatin also shall receive a distribution on the Effective Date from the Company in the amount of $2.5 million and the Debtor's corresponding distribution from the Company shall be made at a later time to be determined in the discretion of the Debtor upon consideration of the financial condition of the Company. Additionally, the Company shall be sold pursuant to the Sale Procedures.

o   Sale Procedures: The process and procedures for the sale of the Company ("Sale Procedures") shall be as set forth in an attachment to the Plan Supplement or if Dikla Unatin and Debtor agree to alternative procedures, such alternative procedures as mutually agreed upon. The Sale Procedures shall provide for a sale of the Company under this Plan. The Sale Procedures, are anticipated to include:

   ▪   A process for the selection of an investment banker upon the agreement of Dikla Unatin and Debtor, provided that if agreement is not reached within 15 days, Dikla Unatin and Debtor shall both identify their top preference and the Judge Scott Clarkson, the Mediator, will interview each proposed

investment banker and make the final selection.

- To be qualified to be considered to be the investment banker, the proposed investment banker must:
  - Have recent and significant e-commerce and branded fashion & apparel transaction experience,
  - Commit to the timing for the sale process,
  - Have a monthly fee not greater than $10,000, which shall be applied against the sale commission,
  - Have a maximum sale commission of $750,000
- Sale schedule shall include:
  - Pre-marketing Preparation Process, during which the Investment banker will gather materials shall be no longer than 45 days.
  - Marketing and Initial Bid Process, during which the investment banker will target and market to potential bidders and solicit bids. Pre-marketing process of no more than 45 days following selection of investment banker
  - Final Sale Process and closing shall take between 30-60 days. Failure to close within the prescribed period of time shall result in forfeiture of deposit.
- Bidder Qualifications.
  - Bidder must have the financial wherewithal to bid at least $20 million.
  - The starting bid shall be $20 million and incremental bids shall be at least $500,000.
  - Bidders shall be required to execute a comprehensive NDA which includes a robust non-circumvent and 3-year period of non-usage.
  - Direct competitors will not be qualified bidders and will not be able to participate.

13

| | | |
|---|---|---|
| | | Other parties shall be excluded only with the approval of the Mediator and/or the agreement of both Dikla Unatin and Debtor. |
| | | o   No stalking horse protections will be provided to any bidder |
| | | o   Bidders must make a $1 million deposit to bid, refundable if not selected as the winning bidder or back-up bidder. Deposit increases to 10% of the purchase price for winning bidder, due within 2 business days of the auction, and is non-refundable once made. |
| | | o   Starting Bid of $20 million. |
| | | o   Incremental bids of at least $0.5 million. |
| | | o |
| **Good Faith Compromise** | | The Plan constitutes a good faith compromise and settlement of all Claims and controversies, and entry of the Confirmation Order will constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of Debtor and his estate. |
| **Discharge, Releases, Injunction and Exculpation** | | Articles 11.3, 11.4, 11.5, and 11.6 of the Plan contain certain release, injunction, and exculpation provisions that are set forth in Article IV.M below. |
| | | **PURSUANT TO ARTICLE 11.3 OF THE PLAN, THE DEBTOR SEEKS A DISCHARGE PURSUANT TO SECTION 1141(D)(5) OF THE BANKRUPTCY CODE AS OF THE FINAL PAYMENT DATE, WHICH WILL RESULT IN CREDITORS BEING ENJOINED FROM TAKING ANY ACTION TO COLLECT, RECOVER OR OFFSET ANY CLAIM AS A PERSONAL LIABILITY OF THE DEBTOR.** |
| | | **ARTICLE 11.4(b) OF THE PLAN (*RELEASES BY HOLDERS OF GENERAL UNSECURED CLAIMS, JUDGMENT CLAIMS, and SECURED CLAIMS*) CONTAINS A THIRD-PARTY RELEASE. IF YOU VOTE TO ACCEPT THE PLAN, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE PLAN'S THIRD-PARTY RELEASE AND ANY ELECTION YOU MAKE TO NOT GRANT THE RELEASE WILL BE INVALIDATED.  IF (1) YOU DO NOT VOTE TO ACCEPT OR REJECT THE PLAN OR (2) VOTE TO REJECT THE PLAN, YOU MAY IN ANY EVENT VOLUNTARILY ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.** |

Doc #  DC/19510608v1

| **Deadlines for Filing Complaints to Determine Non-Dischargeable Debt** | Pursuant to Bankruptcy Rule 4007(c), the deadline to file a complaint to determine the dischargeability of a debt under section 523(c) of the Bankruptcy Code is May 3, 2021 (the date that is sixty (60) days after the first date set for the meeting of creditors under section 341 of the Bankruptcy Code), unless the Bankruptcy Court extends such deadline for cause at the request of a party in interest. |

**B.      Voting on the Plan**

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of claims against Debtor, including setting the deadline for voting, which holders of claims are eligible to receive ballots to vote on the Plan, and other voting procedures.

THE DISCLOSURE STATEMENT ORDER IS HEREBY INCORPORATED BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN. YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.

**1.      Parties Entitled to Vote on the Plan**

Under the Bankruptcy Code, only holders of claims in impaired classes are entitled to vote on the Plan. Pursuant to section 1124 of the Bankruptcy Code, a class of claims is deemed to be impaired under the Plan unless the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim entitles the holder thereof, ascertained with regard to applicable law. The following table sets forth (a) a simplified summary of which classes are entitled to vote on the Plan and which are not and (b) the estimated claims asserted against the Debtor based on the Debtor's Schedules of Assets and Liabilities [ECF Nos. 16-24] (as amended, modified, or supplemented, the "Schedules")[2] and filed proofs of claim, the estimated recovery percentage, and/or the voting status for each of the separate classes of claims provided for in the Plan.[3]

---

[2] On February 5, 2021 Debtor filed his *Schedules of Assets and Liabilities and Statement of Financial Affairs* [ECF Nos. 16-24].

[3] For further details regarding estimated recoveries, please refer to Exhibit B of the Disclosure Statement, entitled

| Class | Designation | Entitled to Vote | Estimated Amount[4] | Estimated Recovery |
|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | No (deemed to accept) | $ 0.00 | 100% |
| 2A | Secured Claim Jason Fung | Yes | $ 103,200 | 100% |
| 2B | Secured Claim of Ravi Sarin | Yes | $ 257,444 | 100% |
| 2C | Secured Claim of Sonia Yu | Yes | $ 103,178 | 100% |
| 2D | Secured Judgment Claim of Dikla Unatin | No | $ 2,350 | 100% |
| 2E | Secured Judgment Claim of Dean Unatin | No | $ 2,350 | 100% |
| 2F | Secured Claim of Casa Hermosa, LLC | Yes | $ 251,563 | 100% |
| 2G | Other Secured Claims | Yes | $ 0.00 | 100% |
| 3A | Unsecured Judgment Claims | Yes | $ 17,193,238 | 100% |
| 3B | General Unsecured Claims | Yes | $ 11,090,350 | 100% |

Holders of claims in Classes 2A to 2C, 2F, 2G and 3A to 3B, as of _____, 2021, the voting record date established by the Debtor for purposes of this solicitation (the "Voting Record Date"), are entitled to vote on the Plan. If your claim is not in Classes 2A to 2C, 2F, 2G or 3A to 3B, you are not entitled to vote on the Plan and you will not receive a ballot with this Disclosure Statement.  If your claim is in Class Classes 2A to 2C, 2F, 2G or 3A to 3B, you should read your ballot and follow the listed instructions carefully. Please use only the ballot that accompanies this Disclosure Statement.

If an objection has been filed with respect to your claim, you are not entitled to vote on the Plan (unless your claim is only disputed in part, in which case you shall be entitled to vote solely on account of the undisputed portion of your claim) unless you obtain an order of the Bankruptcy Court either resolving the objection or temporarily allowing your claim for voting purposes. In addition, if your claim is identified in the Schedules as disputed, contingent, or

---

"Liquidation Analysis."

[4] The estimated amounts of claims are calculated as of the Petition Date and do not account for any objections that may be filed with respect to any Claim and Debtor reserves all rights to object to, or seek estimation of, any such claim.

16

unliquidated and a proof of claim was not (i) filed by the applicable bar date for the filing of proofs of claim established by the Bankruptcy Court or (ii) deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline, such claim shall be disallowed for voting purposes; provided, however, if as of the Voting Record Date, the applicable bar date has not yet passed, such claim shall be entitled to vote only in the amount of $1.00. **As set forth in the Confirmation Hearing Notice (as defined below) and in the Disclosure Statement Order, holders of claims who seek to have their claims temporarily allowed by the Bankruptcy Court for voting purposes must file on the docket and serve on parties entitled to receive service thereof a motion seeking such relief no later than _____ __, 2021 at 4:00 p.m. (Pacific Time).**

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of claims that each creditor is entitled to vote in the chapter 11 case and how votes will be counted under various scenarios.

**<u>Your vote on the Plan is important</u>**. The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Section 1129(b) of the Bankruptcy Code permits confirmation of a plan of reorganization, notwithstanding the nonacceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. Please note that to the extent a class of claims votes against the Plan and therefore does not satisfy section 1129(a)(8) of the Bankruptcy Code, the Debtor will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code. For more information on the requirements for confirmation of the Plan, please refer to Article VII of this Disclosure Statement entitled "Confirmation of the Plan."

Doc #  DC/19510608v1

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the claims of that class that cast ballots for acceptance or rejection of a plan. Thus, acceptance by a class of claims occurs only if at least two-thirds (⅔) in dollar amount and a majority in number of the claims voting cast their ballots to accept the plan.

**2.**    Solicitation Package

The package of materials (the "Solicitation Package") sent to holders of claims entitled to vote on the Plan contains:

- a copy of the notice (the "Confirmation Hearing Notice") of the hearing to consider confirmation of the Plan (the "Confirmation Hearing");

- a copy of this Disclosure Statement together with the exhibits thereto, including the Plan;

- a copy of the Disclosure Statement Order that approved this Disclosure Statement, established the voting procedures, scheduled a Confirmation Hearing, and set the voting deadline and the deadline for objecting to Confirmation of the Plan; and

- for holders of claims in Classes 2A to 2C, 2F, 2G and 3A to 3B, an appropriate form of ballot and instructions on how to complete the ballot.

In addition, the Plan, the Disclosure Statement, and, once they are filed, all exhibits to both documents (including the Plan Supplement) will be filed with the Bankruptcy Court. The Debtor will provide parties in interest (at no charge) with hard copies of the Plan and/or Disclosure Statement, as well as any exhibits thereto, upon request to STEPTOE & JOHNSON LLP, 633 West Fifth Street, Suite 1900 Los Angeles, California 90071, Attn Kerri Lyman; Joshua Taylor Jeffrey Reisner, by sending e-mail correspondence to klyman@steptoe.com; jrtaylor@steptoe.com; jreisner@steptoe.com (please reference "KG-Chapter 11" in the subject line).

Doc #  DC/19510608v1

### 3.     Voting Procedures, Ballots, and Voting Deadline

If you are entitled to vote to accept or reject the Plan, a ballot has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your ballot in accordance with the instructions accompanying your ballot.

You should carefully review (a) the Plan and the Plan Supplement, (b) this Disclosure Statement, (c) the Disclosure Statement Order, (d) the Confirmation Hearing Notice, and (e) the detailed instructions accompanying your ballot prior to voting on the Plan. In order for your vote to be counted, you must complete and return your ballot in accordance with the instructions accompanying your ballot on or before the Voting Deadline.

Each ballot has been coded to reflect your claim. Accordingly, in voting to accept or reject the Plan, you should use the coded ballot sent to you with this Disclosure Statement.

All ballots, in order to be counted, must be properly completed in accordance with the voting instructions on the ballot and **actually received** no later than the Voting Deadline (*i.e.*, **_____, 2021, at 4:00 p.m. (Pacific Time)**)) by STEPTOE & JOHNSON LLP, 633 West Fifth Street. Los Angeles, Suite 1900 California 90071, Attn:  Kerri Lyman; Joshua Taylor; Jeffrey Reisner, via regular mail, overnight courier, or personal delivery at the appropriate address or via email to klyman@steptoe.com;  jrtaylor@steptoe.com;  jreisner@steptoe.com (please reference "KG-Chapter 11" in the subject line).

If a holder of a claim delivers to Steptoe & Johnson LLP more than one timely, properly completed ballot with respect to such claim prior to the Voting Deadline, the ballot that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the last timely, properly completed ballot, received from such holder with respect to such claim.

If you are a holder of a claim who is entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the Disclosure Statement, the Plan, the ballot, or the procedures for voting on the Plan, you can receive a replacement ballot by contacting STEPTOE & JOHNSON LLP, 633 West Fifth Street, Suite 1900, Los Angeles, California 90071, Attn:  Kerri Lyman; Joshua Taylor, Jeffrey Reisner,

1    via    e-mail    correspondence    to    klyman@steptoe.com;    jrtaylor@steptoe.com;

2    jreisner@steptoe.com (please reference "KG-Chapter 11" in the subject line).

3         Before voting on the Plan, each holder of a claim in Classes 2A to 2C, 2F, 2G and 3A or

4    3B should read, in its entirety, this Disclosure Statement, the Plan and the Plan Supplement, the

5    Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions

6    accompanying the ballots. These documents contain important information concerning how

7    claims are classified for voting purposes and how votes will be tabulated. Holders of claims

8    entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code

9    and Bankruptcy Rules and/or consult their own attorney.

10   **C.    Confirmation Hearing and Deadline for Objections to Confirmation**

11        The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on

12   whether the Debtor has fulfilled the confirmation requirements of section 1129 of the Bankruptcy

13   Code. The Confirmation Hearing has been scheduled for _____, 2021, at __:__ __.m.

14   **(Pacific Time)**, before the Honorable Sheri Bluebond, United States Bankruptcy Judge, in

15   Courtroom 1539 of the United States Bankruptcy Court for the Central District of California Los

16   Angeles Division, Roybal Federal Building, 255 E. Temple Street, Los Angeles, California

17   90012 virtually via telephone by CourtCall or via ZoomGov in accordance with the Honorable

18   Sheri    Bluebond's    procedures,    which    can    be    viewed    at

19   https://www.cacb.uscourts.gov/judges/honorable-sheri-bluebond.  The  Confirmation  Hearing

20   may be adjourned from time to time by the Bankruptcy Court without further notice. Any

21   objection to Confirmation must (i) be in writing, (ii) state the name and address of the objecting

22   party and the nature of the claim of such party, (iii) state with particularity the basis and nature

23   of such objection, and (iv) the amount of the claim held by the objector. Objections to

24   confirmation of the Plan are governed by Bankruptcy Rule 9014. Any such objections must be

25   filed and timely served upon the persons designated in the Confirmation Hearing Notice in the

26   manner and by the deadline described therein, including service upon the following parties: i)

27   Office of the United States Trustee for the Central District of California, 915 Wilshire Blvd.,

28   Suite. 1850, Los Angeles, California 90017 (Attn: Eryk R Escobar, eryk.r.escobar@usdoj.gov,

and Kenneth.g.lau@usdoj.gov); (ii) counsel for the Debtor, Steptoe & Johnson, LLP, 633 West Fifth Street, Suite 1900 Los Angeles, California 90071 (Attn: Keri Lyman, Joshua Taylor, Jeffrey Reisner), Email: jreisner@steptoe.com; klyman@steptoe.com; jrtaylor@steptoe.com; jreisner@steptoe.com (iii) special bankruptcy litigation counsel for the Debtor, Theodora Oringher, 535 Anton Blvd., Ninth Floor, Costa Mesa, CA 92626 (Attn: William N. Lobel), Email: wlobel@tocounsel.com; and (iv) counsel to the Creditors' Committee, Hogan Lovells US LLP, 1999 Avenue of the Stars, Suite 1400, Los Angeles California, 90067 (Attn: Richard L. Wynne, Edward J. McNeilly, Richard.wynne@hoganlovells.com, Edward.mcneilly@hoganlovells.com).

**D.    Professionals and Advisors**

The Debtor's bankruptcy counsel is Steptoe & Johnson LLP.  The Debtor's bankruptcy professionals and advisors can be contacted at:

STEPTOE & JOHNSON LLP
Jeffrey Reisner
Kerri Lyman
Joshua Taylor
633 West Fifth Street, Suite 1900
Los Angeles, California 90071
Telephone: (213) 439-9423
Email: jreisner@steptoe.com;
klyman@steptoe.com;
jrtaylor@steptoe.com

THEODORA ORINGHER
William N. Lobel
535 Anton Blvd., Ninth Floor
Costa Mesa, CA 92626
Telephone: 714-549-6200
Email: wlobel@tocounsel.com

FORCE TEN PARTNERS, LLC
Michael VanderLey
5271 California Ave., Suite 270
Irvine, CA 92617
Telephone: 949-357-2360
Email: mvanderley@force10partners.com

A. LAVAR TAYLOR LLP
A. Lavar Taylor
3 Hutton Centre Drive, Suite 500
Santa Ana, CA 92707
Telephone: 714-546-0445
Email: ltaylor@taylorlaw.com

# II.

## GENERAL INFORMATION

### A.    Debtor's Background

Kfir Gavrieli, the Debtor and debtor-in-possession, resides in Los Angeles.  He received his BA in in Economics from Stanford in 2004, followed by a MS in Material Science and Engineering in 2005. Debtor also received an MBA from Stanford Graduate School of Business in 2008.  He is a self-employed entrepreneur and serves as the CEO of a company that he co-founded and co-owns.  He also owns non-controlling, passive investment interests in a number of real estate, technology, energy, healthcare, and other ventures.  He is actively involved in several non-profits.

*The discussion of the Debtor and the Debtor's investments are for informational purposes only. This Disclosure Statement and related materials relate only to the Plan of the Debtor and do not relate to and should not be deemed to suggest that any of the entities in which the Debtor owns an interest, including the Company (defined below), is seeking a plan of reorganization or bankruptcy at this time.  Debtor will retain ownership and control of all of his assets and investments, including his management rights and interests in those assets and companies where such management rights existed as of the Petition Date.  Any information about the investments is provided to creditors of Debtor solely to assist them in their evaluation of the Plan. Although there is a discussion in this Disclosure Statement about the investments, such information is based on information obtained by the Debtor solely for use herein.  The information about the investments is believed by Debtor to be reliable.  However, such information relates only to circumstances as of the dates the information was available and there can be no assurance that subsequent occurrences have not rendered such information inaccurate.*

### 1.    The Company

After graduating from college, Debtor worked at various companies in venture capital, hedge fund, technology, and real estate industries.  Nevertheless, having grown up in a family business, it was always his dream to start his own company.  After graduating from business school in 2008, Debtor co-founded Gavrieli Brands, LLC (the "<u>Company</u>") with his sister, Dikla

Unatin ("<u>Dikla</u>").  The Company was established as a California limited liability company in 2009.[5]

The Company is a footwear company located in Culver City, California.  The Company sells foldable, high-end footwear known as Tieks or Tieks by Gavrieli, which are designed to be both stylish and easily portable, comfortably fitting in a woman's handbag.  The Company was one of the first fashion companies to sell exclusively online and was one of the top online-only fashion brands in the world for several years.  The Company and its ground-breaking products and marketing techniques have been recognized in the national press, including by Forbes ("25 Most Innovative Consumer Brands"), Inc. ("30 Under 30"), Entrepreneur ("Top 30 Startups to Watch"), The Oprah Magazine ("The O List"), and others.

Debtor has served as the CEO of the Company since its inception and is primarily responsible for the engineering of the revolutionary Tieks shoe, as well as the Company's equally revolutionary online-only approach and direct-to-consumer sales and marketing strategies.  As a result of his leadership and the extraordinary efforts of the entire team, the Company has grown from a start-up with no products, customers, or revenue into a company with dozens of intricately designed and patent-protected products, a passionate fan base, millions of dollars in annual sales, and nearly 50 employees.

Notwithstanding the Company's success, the fashion industry generally, and the footwear business specifically, are highly competitive. This competition has increased sharply in recent years with dramatically lower barriers to entry in the industry. In its early days, the Company was one of the only businesses in the online-only fashion space and enjoyed success as an e-commerce pioneer, but today that space is increasingly crowded with well-funded new entrants. Moreover, although the Company was an early pioneer in social media advertising, today that space is crowded with millions of other advertisers.

In addition to both direct and indirect competition from new and existing brands and manufacturers, consumer preferences change over time, including in response to disruptive

---

[5] The Company does not have a written operating agreement.

Doc #  DC/19510608v1

1   events like the COVID-19 pandemic—particularly for luxury goods such as the Company's

2   signature product. The Company's recent performance reflects this increased competition and

3   costs of customer acquisition and retention, as well as downward pressures on demand.

4          It would be unreasonable to think that the dramatic increase in online competition would

5   have had no effect on the Company's sales. In addition, the number of fashion retailers (including

6   e-commerce fashion brands) announcing Chapter 11 filings or outright closings in the

7   mainstream press suggests the industry has been under intense competitive pressure and liquidity

8   constraints.

9          The economic uncertainty that began with increased competition in the past several

10  years has been compounded significantly by the COVID pandemic. With supply chains

11  challenged, costs rising, competition increasing, and demand dropping, it is critical that the

12  Company be in a position to devote substantial funds to maintaining its market share in a post-

13  COVID market. Among other things, to retain or gain market share against increasingly

14  sophisticated and well-funded competitors, the Company may need to significantly expand its

15  sales and marketing channels.

16         Due to the Company's recent downward trajectory in sales and income and the fact that

17  the owners have been in active litigation with one another for over three years, including the

18  recently filed Adversary Proceeding, obtaining reasonable outside financing to compete with

19  increasingly well- funded competitors would be very difficult.  Accordingly, the Company does

20  not have the characteristics of an ideal borrower.

21         At this time, maintaining ample (even more-than-ample) cash reserves is prudent.

22  Inasmuch as the Court and most of the professionals in this case are accustomed to working with

23  and/or observing businesses undergoing severe economic pressure, maintaining a strong cash

24  balance (versus making distributions to members) is one of the hallmarks of responsible

25  management.  Therefore, it is unlikely that the Company will be able to make any distributions

26  beyond (i) that required for taxes on account of company earnings for the applicable year, (ii)

27  Company OVDP Distribution (and the Debtor's Share of the Company OVDP Distribution), and

28  (iii) in connection with a Plan Election selecting Plan Option 3.

Doc #  DC/19510608v1

In the years 2018, 2019, and 2020, Debtor received no distributions from the Company other than distributions for the payment of taxes attributable to income from the Company. This was due in part to the fact that since the initiation of litigation in 2017, as described below, there has been an injunction in place that limits the use of company funds for non-business expenses and because both Dikla and Debtor both must consent to any distribution of Company funds. Moreover, due to the Company's significant economic challenges, it is unlikely that significant personal distributions will be possible in the near future consistent with the Company's best interests. The economic uncertainty that began with increased competition in the past several years has been compounded significantly by the COVID pandemic. With supply chains suffering serious disruptions, costs rising, competition increasing, and demand dropping, it is critical that the Company be in a position to devote substantial funds to maintaining its market share in the post-COVID market. Among other things, to retain or gain market share against increasingly sophisticated and well-funded competitors, the Company may need to significantly expand its sales and marketing channels. And due to the Company's recent downward trajectory in sales and income, obtaining reasonable outside financing would be very difficult. In addition, it is the Debtor's position that the Company may have significant indemnity obligations with respect to the Adversary Proceeding and therefore may need to retain cash. Due to these factors, the Company will likely continue to require significant cash retention for several years. The Plan proposed by the Debtor does not contemplate the use of any assets of the Company to satisfy claims under the Plan. Debtor does not anticipate any distributions from the Company other than (i) distributions for the payment of taxes during the Plan period, (ii) Company OVDP Distribution (and the Debtor's Share of the Company OVDP Distribution), and (iii) in connection with a Plan Election selecting Plan Option 3, and therefore does not rely on any such other distributions in proposing the Plan.

**2.    Charitable Work**

Debtor has long maintained a personal and professional commitment to charitable work. For many years, the Company has contributed to Kiva, an online microlending platform that supports and empowers women in the developing world, lending over $10 million to women

entrepreneurs.  In fact, the Company is the largest single donor in the world on that platform. More recently, the Debtor led the Company in conceiving and spearheading a campaign called "#SewTogether" to provide masks to health care workers battling COVID-19.  Through this campaign, which received praise from individuals and media across the country, the Company and its fans were able to provide more than one million masks to front-line workers.

Debtor is also personally involved in a number of charitable organizations and makes donations to a variety of causes.  Among other things, he serves as a member of the Board of Directors for the American Friends of the Israel Philharmonic Orchestra and for the Israeli American Council.  He is also involved in and has donated to several other non-profit organizations, including Campaign against Antisemitism, CIA Officers Memorial Fund, Holocaust Memorial Museum, Jewish Graduate Students Initiative, Israel Christian Nexus, Bet Tzedek, Yad Vashem, The Jewish Federation, Birthright Israel Foundation, American Friends of Magen David Adom, and many others.

### 3.    Litigation regarding the Company

Several years ago, disputes between the Debtor, his sister, "Dikla," and Dikla's husband Dean Unatin ("Dean") arose.  Because the Company was a family business, up until 2017 Dikla and Debtor had always operated the business through oral agreements rather than signed contracts.  The Company experienced rapid growth until 2016, but this growth began to stall in 2017, while Debtor was away from the business addressing medical issues.  In late 2017, disagreements arose regarding the oral agreements that had governed the Company, which ultimately resulted in Dean being terminated from the Company and a dispute between Debtor and Dikla regarding ownership and control of the Company.

On December 13, 2017, Dikla commenced litigation (the "Litigation") by filing a lawsuit against the Debtor, *Dikla Gavrieli a/k/a Dikla Gavrieli Unatin v. Kfir Gavrieli*, Case No. BC 686856, in the Superior Court of the State of California ("State Court").

A detailed description of the procedural history and present status of the litigation is contained in the *Declaration of Kfir Gavrieli In Support of First Day Motions* [ECF No. 36] at pages 16-27.

Doc #  DC/19510608v1

The judgment ("Judgment") entered in the litigation, following post-judgment motions, was $16,906,251.65, including prejudgment interest, but before the application of post-judgment interest. The post-judgment motions reduced the original amount of the Judgment by over $20,000,000. The Judgment is currently on appeal and the Debtor believes that as a result of the appeal, and potential new trial on remand from the appeal, the amount of the Judgment will be greatly reduced or entirely eliminated.

On January 22, 2021, the Debtor appealed the Amended Judgment. On appeal, Debtor intends to challenge the Amended Judgment, including, among other things, the entirety of the monetary awards and the declaration that Debtor owns only 50% of the Company rather than 60%. On January 26, 2021, Dikla and Dean filed a cross-appeal of the Amended Judgment. As part of the appeal, Debtor seeks to overturn the Judgment against him, including seeking a new trial on his affirmative claims, with potentially increased damages requests against Dean. Debtor believes strongly that the jury's verdict against him was influenced by prejudice due to false and inflammatory allegations that were irrelevant to the case, as well as improperly inflammatory argumentation at trial. Debtor intends to pursue the appeal vigorously and seek a new trial that is free from such prejudicial (and false) evidence. On appeal, Debtor also intends to assert that many of the damages awarded by the jury are not legally available.

Additionally, as explained in Section III.F., Dikla Unatin has filed an Adversary Proceeding asserting derivative claims on behalf of the Company against the Debtor.

Whether or not the Debtor prevails in his appeal, and the extent to which he prevails, will not affect either the terms of the Plan as to other creditors or the feasibility of the Plan.

**B.    Subject to the terms of a Plan Option selected in the Plan Election, the Debtor will retain, pursuant to the Plan, all Claims or Causes of Action he has against Dikla, Dean, and their affiliates. Debtor's Assets**

**1.    The Company**

Pursuant to the Judgment, the Debtor retains a 50% membership interest in the Company. Debtor has appealed the Judgment because he believes he owns 60% of the Company. The Debtor did not receive any distributions from the Company in 2020 other than distributions for

the payment of taxes and does not anticipate any distributions from the Company during the period of the Plan other than (i) distributions for the payment of current income taxes, (ii) Company OVDP Distribution (and the Debtor's Share of the Company OVDP Distribution), and (iii) in connection with a Plan Election selecting Plan Option 3.  Therefore, proposed distributions under the Plan are not contemplated to come from this interest other than those set forth above.

The estimated value of the Debtor's interest in the Company was developed by applying a range of multiples to the Company's estimated 2020 EBITDA,[6] adding the difference between balance sheet cash and an estimate of hypothetical "normalized" cash and multiplying the result by the Debtor's 50% ownership interest (a percentage which remains on appeal).  These calculations produced a range of estimated values of approximately $20.0-$23.5 million.  Due to the fact that typical discounts such as small company, key man, and lack of control were not applied, and to be conservative, the low end of the range was reflected in the Schedules.

### 2. Debtor's Investments

In 2015, Debtor began investing in various real estate, technology, energy, healthcare, and other ventures (the "Private Investments").  As a result of these Private Investments, Debtor holds a non-controlling interest in 14 companies, most of which focus on real estate, technology, or energy.  Some of the Debtor's friends and/or family are also involved in some of the Private Investments discussed herein.

In instances where the Debtor recently invested in a new asset, the Debtor's purchase price was used as the base value.  In other instances, the Debtor's advisors and the investment sponsors reviewed information that served as the basis for the estimates.

Debtor owns approximately 0.6% of Aspiration Partners, Inc., which provides socially conscious and, sustainable banking, investment, and financial services.  Debtor's interest as of the Petition Date was valued at approximately $5.2 million.

---

[6] Earnings Before Interest, Taxes, Depreciation and Amortization (EBITDA).  The estimated EBITDA was provided in late January 2021 by the Company's accountant, when the Company's 2020 books were not yet closed, and an actual EBITDA figure was unavailable.

Doc #  DC/19510608v1

Debtor owns approximately 51.4% of Macon MB, LLC which owns, directly or indirectly, three multi-family residential projects located in Aurora, Colorado. Debtor's interest as of the Petition Date was valued at approximately $2.8 million. Debtor anticipates that the underlying real estate will be sold and final distributions will occur in 2023.

Debtor owns an approximate 21.8% limited partnership interest in 10401 Jefferson LP, which owns a fully leased, single-tenant, 15,400 square foot office building in Culver City, California. Debtor's interest as of the Petition Date was valued at approximately $1.4 million. Debtor believes that the underlying real estate will be held for cash flow and therefore anticipates receiving partnership distributions each year during the plan period from this investment.

Debtor owns an approximately 12.2% limited partnership interest in 4645 Live Oak, LLC, which owns a 27-unit apartment property that is located in Cudahy, CA. Debtor's interest as of the Petition Date was valued at approximately $0.8 million. Debtor believes that the underlying real estate will be held for cash flow and therefore anticipates receiving partnership distributions each year during the plan period from this investment.

Debtor owns an approximately 10.3% limited partnership interest in 12414 Exposition LP which owns a fully leased, single-tenant office building in Los Angeles, California. Debtor's interest as of the Petition Date was valued at approximately $3.0 million. Subsequent to the petition date, the underlying asset was sold and the proceeds distributed and the Estate received $3,006,526 on account of his interest.

Debtor owns approximately 18.1% of WaveHealth Partners I, LLC, which owns a minority interest in Ocean Holdings LLC which, in turn, owns Oceans Healthcare, a provider of inpatient and outpatient behavioral health services in Texas, Louisiana, and Mississippi. Oceans Healthcare is based in Plano, Texas. Debtor's interest as of the Petition Date was valued at approximately $5.0 million. Debtor anticipates a liquidity event on account of his ownership interest that will result in the final distribution from this investment in 2022.

Debtor owns an approximately 0.6% ownership on a fully diluted basis of Nantero, Inc., a technology company that develops memory technology for use in smartphones, tablets, enterprise systems, and notebook and desktop computers. Debtor's interest as of the Petition

1   Date was valued at approximately $2.0 million. Debtor has a put option with respect to these

2   shares that can be exercised in December 2022 for $2.0 million. The Plan currently

3   conservatively contemplates the exercise of that put option.

4        Debtor owns an approximately 0.5% ownership on a fully diluted basis of Cleopatra

5   Resources LLC, a company that owns natural gas distribution assets. Debtor's interest as of the

6   Petition Date was valued at approximately $500,000. Debtor anticipates receiving an annual

7   dividend of approximately $6,000 until the investment is disposed of.

8        Debtor owns approximately 18.8% of FDLSF Opportunities LLC, a limited liability

9   company that acquired portions of the "1st Out" and "2nd Out" tranches of the $174 million (par

10  value) first lien term loan debt of Sunrise Oil & Gas, LLC. Debtor's interest as of the Petition

11  Date was valued at approximately $750,000. Debtor anticipates receiving distributions of

12  income and principal as the note is repaid.

13       Debtor owns approximately 4.8% of Permian Yield I LLC, which is a company that

14  acquired producing oil wells in west Texas and New Mexico from a public energy and power

15  company. Debtor's interest as of the Petition Date was valued at approximately $250,000.

16  Debtor expects to receive distributions over the Plan period.

17       Debtor owns an approximately 3.3% limited partnership interest in Halogen Ventures LP,

18  a venture capital fund. Debtor's interest as of the Petition Date was valued at approximately

19  $125,000. Debtor expects no distributions during the Plan period.[7]

20       Debtor owns an approximately 1.0% ownership interest on a fully diluted basis of

21  FairClaims, Inc. Debtor's interest as of the Petition Date was valued at approximately $143,000.

22  The Financial Projections anticipate a final distribution in 2026.

23       Debtor owns approximately 13.6% of Change the Channel LLC which operates a

24  restaurant, Mason. As a result of Covid-19, the restaurant remains closed. Debtor's interest as

25

26

27  _____

28  [7] As discussed above, Dikla also owns a portion of Halogen Ventures. The figures here represent the value only of Debtor's 50% interest in Halogen Ventures. As part of his appeal, Debtor is challenging the determination that he owns 50% rather than 60% of Halogen.

Doc #  DC/19510608v1

of the Petition Date was valued at approximately $250,000.  The Financial Projections anticipate a final distribution in 2026.

Debtor owns an approximately 0.7% ownership interest on a fully diluted basis, in IvyConnect, Inc., a social network company.  Debtor's interest as of the Petition Date was valued at approximately $488,000.  The Financial Projections anticipate a final distribution in 2026.

**3.     Cash, Bank Accounts, Tax Refunds, Loans**

As of the Petition Date, the Debtor had approximately $200,000 in his checking and savings accounts.

Debtor owns certain cryptocurrency which was valued at approximately $2.2 million as of the close of business on January 29, 2021.   Additionally, approximately $500,000 of cryptocurrency was stolen in 2019, which Debtor estimates has a current value of approximately $1.5 million.   Debtor is retaining any and all causes of action with respect to the stolen cryptocurrency.  The Financial Projections anticipate a liquidation in 2024.

Pursuant to the Judgment, Debtor has a 50% interest in the Hong Kong Accounts.  Those accounts are estimated to have a value of approximately $13.2 million in total.  An overseas family member of Debtor and Dikla has signing authority on the Hong Kong Accounts.  The Financial Projections anticipate a distribution in late 2023 or early 2024.  The Debtor anticipates recovery expenses associated with the Hong Kong Accounts of approximately $1 million.  The Plan conservatively contemplates that it may take the Debtor three years to access and repatriate the funds in the Hong Kong Accounts.  There are many reasons for this conservative estimate, including that the funds are not held in the Debtors name, the overseas family member of Debtor and Dikla in whose name the funds are held and who has signing authority on the Hong Kong Accounts is not located in Hong Kong. Currently, he is unwilling to go to Hong Kong due to COVID concerns among other reasons according to the cousin.  The Hong Kong Accounts are currently frozen or inactive and online access to the funds is not possible at present.  Therefore, the Debtor does not have immediate access to the Hong Kong Accounts and funds in those accounts.  As explained herein, the Debtor has entered into a Stipulation with the Committee, which, subject to Court approval, would appoint the Committee as the Estate Representative of

the Debtor and the Estate with authority to deal with, and to take all actions reasonably necessary to seek to recover the funds in, the Hong Kong Accounts and to pursue investigations into Stephen Lai CPA & Co, to the extent related to recovery of the Hong Kong Funds.

Debtor has also made two unsecured loans to Apogee Pacific, LLC. The first loan is in the face amount of $5.0 million and matures on May 31, 2021. The first was repaid timely and pursuant to its terms. The second loan is in the face amount of $2.5 million and matured on February 28, 2021. The second loan was repaid timely and pursuant to its terms.

Subject to the filing of amended tax returns, Debtor further anticipates receiving tax refunds related to tax years from 2017 to 2019 in an estimated net amount of $6.1 million, which Debtor anticipates receiving in 2021 and 2022.[8]

### 4.    Other Assets

Debtor owns a 2005 Mercedes CLK 500 which he has leased to a third party. Pursuant to the lease agreement, Debtor receives $200 per month.

### C.    Debtor's Liabilities[9]

The claims against Debtor fall into four general categories: (i) tax claims, (ii) claims against Debtor secured by his assets, (iii) claims against Debtor based on judgments, and (iv) claims against Debtor that are unsecured. Some of the Debtor's liabilities are owed to friends and/or family of the Debtor, including with respect to money owed on account of loans from such persons. The Debtor also counts amongst his assets, loans made to others when he had excess cash.

In addition to the State Court Judgment of approximately $16.9 million, which has not become final and is pending appeal, the following is a summary of the Debtor's major debts.

Debtor owes the Internal Revenue Service ("IRS") and the California Franchise Tax Board ("FTB") for taxes on funds held in the Hong Kong Accounts and past underpayments of

---

[8] Debtor continues to assert that he owns 60% of the Company.

[9] The liabilities listed are only the Debtor's current estimate of potential liability. Debtor reserves all rights to challenge, contest, and dispute any claims asserted by any party against the Debtor. The information is simply for purposes of providing general estimates for the purposes of evaluating the Plan and shall not be considered admissions as to liability or amount thereof.

certain tax liabilities.  Dikla, Dean, and Debtor have been accepted into the IRS Offshore Voluntary Disclosure Program ("OVDP"), which is a program that allows individuals to voluntarily report foreign financial assets and pay taxes on those assets.  Debtor is currently working with his retained professionals to analyze and determine the amount owed.  Based on currently available information, Debtor estimates that his liability, including taxes, interest and penalties, to the IRS and FTB to be approximately $14 million, including approximately $11.7 million owed to the IRS and approximately $2.3 million owed to the FTB.  The Plan provides that the Debtor will make payment of all amounts owed to the IRS and FTB, plus interest, over the first two-year period following the Effective Date of the Plan.

Debtor owes approximately (i) $450,000, plus interest, on account of three secured recourse loans, (ii) $250,000, plus interest, on account of a non-recourse secured loan, (iii) approximately $6.9 million, plus interest, on account of unsecured loans, and (iv) approximately $3.6 million, plus interest, to his mother and father, on account of financial support that they separately provided to him in connection with the Litigation against his sister.

As of January 1, 2021, Debtor owed Mr. Nir approximately $11,805,109.27 on account of loans.  Prior to the Petition Date, pursuant to an agreement between Mr. Nir and Debtor, Mr. Nir agreed to reduce the total current indebtedness to $3,242,224.05.  The reduction was the result of Mr. Nir and his designees purchasing all of the Debtor's non-control and illiquid interests in AQP Capital Partners I, LLC and AQP Capital Partners II, LLC, and approximately 80% of the Debtor's interest in 4645 Live Oak LLC for a combined $5.56 million, plus an additional discount of $1.5 million (for a total reduction of the amount owed of $7.06 million). In addition, the Debtor also obtained a reduced interest rate (a reduction in the annual interest rate from 15% to 7% from the inception of the loan in 2017).

**D.    Reasons for Bankruptcy Filing**

Following entry of the Judgment, Debtor was faced with significant personal liability. Although the Debtor continues to have disposable cash and income from his personal investments sufficient to cover his living expenses, his current income is insufficient to pay the Judgment in full on the effective date of a plan of reorganization (even if such amount was finally liquidated,

which it is not), as well as tax liabilities and the debt that the Debtor was obligated to take out in order to pay the significant legal fees that he incurred throughout the Litigation and is continuing to accrue in the appeal.  Given the Debtor's current liquidity situation, Debtor had no choice but to file this Chapter 11 case, and to continue to prosecute his appeal of the Judgment.  However, Debtor fully anticipates that his financial situation and cash inflows, including recurring interest and dividends, repayments due on loans receivable, new investment distributions and tax refunds, will allow him to pay all of these obligations, in full with interest, over time, as set forth in the Plan and described herein.

**E.    Funding of the Plan**

As explained above, the Plan provides for Cash payment in an aggregate amount of such Allowed Priority Tax Claims payable in semi-annual payments, on the Semi-Annual Distribution Dates, with Interest accruing at the Applicable Interest Rate from the Petition Date. With respect to Secured Claims in Classes 2A to 2C, and 2G, the Plan provides for the payment of Cash in ten (10) equal semi-annual payments of principal and interest on the Semi-Annual Distribution Dates, computed on the amount of the value of the Allowed Secured Claim plus Interest at the Applicable Interest Rate accruing from the Petition Date or the return of Collateral securing the Secured Claim.  With respect to Secured Claims in Classes 2D and 2E, the Plan provides for the return of the Collateral securing such claims.  With respect to Secured Claim in Class 2F, the Plan provides for the payment of all proceeds of the Collateral securing such claim until paid in full.  With respect to Unsecured Claims, the Plan provides for payments of Cash in  semi-annual payments of principal and interest, commencing upon payment in full of the Priority Tax Claims, computed on the amount of the value of the Allowed General Unsecured Claim plus Interest at the Applicable Interest Rate accruing from the Petition Date.

Except as otherwise provided in the Plan, as of the Effective Date, all property of the Estate, and any property acquired by the Debtor, Estate or Reorganized Debtor under the Plan, shall be owned free and clear of all Claims, Liens, charges, other encumbrances and interests. The Bankruptcy Estate shall continue in existence following the Effective Date until such time as the Bankruptcy Estate is terminated in accordance with provisions of Article 11.1 of the Plan.

Doc #  DC/19510608v1

All property of the Estate that is owned by the Bankruptcy Estate as of the Effective Date shall remain property of the Estate until such time as that property is sold or abandoned, or until the Estate is terminated in accordance with the provisions of Article 11.1 of the Plan, at which time, all property of the Estate, and any property acquired by the Debtor, Estate, or Reorganized Debtor under the Plan, shall vest in the Reorganized Debtor, free and clear of all Claims, Liens, charges, other encumbrances and interests.  The Reorganized Debtor shall act as the representative of the Bankruptcy Estate for all purposes.

Except as otherwise provided in the Plan or Confirmation Order, all Cash required for payments to be made hereunder shall be funded from the Debtor's and Reorganized Debtor's Cash balances, future income and earnings, borrowings, recurring cash distributions from investments, cash distributions on account of liquidity events (e.g., a financing, acquisition, merger, initial public offering or other event that allows investors the ability to cash out some or all of their ownership interests) involving the businesses in which the Debtor holds investments, or the sale of any of the Debtor's other assets.

Debtor does not anticipate any disposition of, or any distributions from the Company during the time period contemplated in this Plan beyond (i) tax payments attributable to his interest in the Company, which will continue to be so used, (ii) Company OVDP Distribution (and the Debtor's Share of the Company OVDP Distribution), and (iii) in connection with a Plan Election selecting Plan Option 3.  The Plan does not contemplate that any other distributions from the Company will be used to make payments under the Plan.

Attached hereto as **Exhibit C** (Financial Projections), are financial projections, reflecting the estimated cash inflows and outflows during the Plan Period, as described above.

**F.     Backstop**

Prior to or co-extensive with the Effective Date, Debtor entered into a Revolving Credit Agreement ("Plan Backstop"), attached hereto as **Exhibit E**, with RJB Partners, LLC ("RJB") pursuant to which RJB, as lender, will agree to establish a revolving credit account to permit the Debtor to borrow up to $30 million for payment of obligations due under a Debtor-sponsored plan of reorganization to the extent of any shortfall of Borrower thereunder with respect to the

Doc #  DC/19510608v1

semi-annual payments due under the Plan. The Plan Backstop will accrue interest at seven percent (7%) on amounts outstanding under the revolving credit facility, with the entire principal and interest payable on the earlier of December 31, 2031 or the last day of the calendar month that is 365 days following Debtor's final payment pursuant to this Plan, with all such repayment to occur outside of the Plan after completion of the distributions and payments contemplated in this Plan.  To the extent other sources of funding are not sufficient to cover the payments required under the Plan, the Debtor shall borrow sufficient funds pursuant to the Plan Backstop to make the required distributions under the Plan, where such funds also will be due to be repaid after Debtor's Plan obligations.  A copy of the Plan Backstop will be provided in the Plan Supplement. To the extent that Claims exceed expected amounts and additional amounts are required, the Debtor shall have the right to obtain a further backstop, provided that such backstop shall not be repaid during the term of this Plan.  As a result of amendments to the Plan, the Plan Backstop had to be adjusted.  The Debtor has reached agreement on a new form of the Plan Backstop.

If a Plan Option is elected in a Plan Election, the Debtor shall obtain financing providing sufficient liquidity to satisfy the obligations of such Plan Option prior to the Effective Date.

## III.

## THE CHAPTER 11 CASE

A.    **Voluntary Petition**

On February 1, 2021 (the "Petition Date"), Debtor commenced the chapter 11 case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

B.    **Retention of Advisors for the Debtor**

Debtor has retained the following professional firms to assist with his chapter 11 case: (i) Steptoe & Johnson LLP, as general bankruptcy counsel; (ii) Theodora Oringher, as special bankruptcy litigation counsel, (iii) the Offices of A. Lavar Taylor LLP, as special bankruptcy tax counsel, (iv) Hochman Salkin Toscher Perez P.C., as special OVDP Counsel,[10] (v) Hueston

---

[10] Served as prepetition tax counsel.

1  Hennigan LLP, as special litigation counsel,[11] (vi) Horvitz & Levy, as special appellate counsel,[12]

2  (vii) Holland and Hart, as special litigation counsel,[13] (viii) Force Ten Partners, LLC, as financial

3  advisor, and (ix) Krost, CPAs and Consultants as accountants.

4  **C.      The Creditors' Committee**

5          On March 10, 2021, the U.S. Trustee appointed the Official Committee of Unsecured

6  Creditors (the "Creditors' Committee") in this chapter 11 case pursuant to section 1102(a)(1) of

7  the Bankruptcy Code [ECF No. 116]. The Creditors' Committee consists of the following

8  members: (i) Roman Margolin; (ii) Adam Milstein; (iii) Ronald Jose Paz Vargas; (iv) Dick

9  Brouwer; and (v) Eyal Bilgrai.

10         The Creditors' Committee has retained Hogan Lovells, as bankruptcy counsel.  The

11  Committee has employed KGI Advisors, Inc. as financial advisor.

12  **D.      Statements, Schedules, and Claims Bar Date**

13         On February 5, 2021, Debtor filed his (i) Schedules identifying the assets and liabilities

14  of his estate and (ii) Statement of Financial Affairs [ECF Nos. 16-19].  On April 27, 2021 and

15  April 28, 2021, Debtor filed amended Schedules [ECF Nos. 219, 220, 223, 2287]

16         On February 12, 2021, the Bankruptcy Court entered an order [ECF No. 60] (the "Bar

17  Date Order") establishing the deadlines for the filing of proofs of claim in this chapter 11 case.

18  These dates are as follows:

19      •   the deadline for creditors (other than governmental units and certain other

20          parties excused from filing proofs of claim under the Bar Date Order) to file

21          proofs of claim against the Debtor is April 30, 2021, (the "General Bar Date");

22      •   the deadline for governmental units to file proofs of claim against the Debtor is

23          August 2, 2021, at 5:00 p.m. (PT);

24      •   a bar date for claims amended or supplemented by an amendment to the

25          Schedules by the later of (a) the General Bar Date; and (b) the date that is

26

27  ---
[11] Served as prepetition litigation counsel.
28  [12] Served as prepetition appellate counsel.
[13] Steven Tensmeyer moved his practice from Hueston Hennigan LLP to Holland and Hart in January of 2021 and
was a key associate resource in the state court Litigation.  He will serve in the same capacity at his new firm.

Doc #  DC/19510608v1

twenty-one (21) days after the date that notice of the applicable amendment to the Schedules is served on the claimant; and

- a bar date for any claims arising from or relating to the rejection of executory contracts or unexpired leases, in accordance with section 365 of the Bankruptcy Code by the later of (a) the General Bar Date; (b) the date that is thirty (30) days after the entry of the order authorizing the rejection of the executory contract or unexpired lease; and (c) any date that the Bankruptcy Court may fix in the applicable order approving such rejection.

Debtor provided notice of the bar dates above as required by the Bar Date Order.

As of the General Bar Date, nine (9) proofs of claim were filed: (i) the Department of Treasury – Internal Revenue Service filed a claim in the amount of $15661,782.46, $11,197,731.64 of which was asserted as a priority claim, (ii) the Department of Treasury – Internal Revenue Service filed a claim in the amount of $6,644,704, (iii) Adam Milstein filed an unsecured claim in the amount of $208,473.38, (iv) Dick Brouwer filed an unsecured claim in the amount of $260,068, (v) Eyal Bilgrai filed an unsecured claim in the amount of $104,121.83, (vi) Ronald Vargas filed an unsecured claim in the amount of $520,178.42, (vii) GAM Investments LLC filed an unsecured claim in the amount of $208,388.89, (viii) Dikla Unatin filed a claim asserting secured and unsecured claims related to the Judgment and the Adversary Proceeding; and (ix) Dean Unatin filed a claim asserting secured and unsecured claims related to the Judgment and the Adversary Proceeding.

Debtor is working with the IRS to reach agreement on the appropriate amount of the claims held by the IRS. Debtor disputes the claims asserted by Dikla Unatin and Dean Unatin. Debtor is reviewing and analyzing the filed Claims, and will reconcile objections to the filed Claims as appropriate.

## E.    Exclusivity

Section 1121(b) of the Bankruptcy Code provides for a period of 120 days after the commencement of a chapter 11 case during which time a debtor has the exclusive right to file a plan of reorganization (the "Exclusive Plan Period"). In addition, section 1121(c)(3) of the

Bankruptcy Code provides that if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "Exclusive Solicitation Period," and together with the Exclusive Plan Period, the "Exclusive Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods. The current Exclusive Periods are June 1, 2021 and August 2, 2021, respectively.  On May 28, 2021, the Debtor filed a motion seeking an extension of the Exclusive Periods to August 2, 2021 and October 4, 2021, respectively.  As of the date hereof, such motion remains subject to approval by the Bankruptcy Court.

**F.    Adversary Proceedings**

On February 19, 2021, the Unatins commenced an adversary proceeding (the "Adversary") against the Debtor.  The Unatins assert thirteen causes of action including (i) four individual causes of action including multiple non-dischargeability claims, contractual indemnity, unjust enrichment, and (ii) nine derivative claims including expulsion of the Debtor from the Company, appointment of a receiver for the Company, breach of fiduciary duty, corporate waste, conversation, violation of California Penal Code § 496, requesting an accounting, and non-dischargeability (the "Original Adversary Complaint").  Dikla asserts that allegedly new individual claims to enforce a tax indemnity agreement and unjust enrichment will result in a judgment of $10 to $15 million.  The Unatins also claim that damages on the derivative claims are likely to exceed $100 million.

On March 24, 2021, the Debtor filed a Motion to Dismiss the Original Adversary Complaint seeking to dismiss the claims filed in the Original Adversary Complaint.  Debtor believes that none of these claims will be allowed.

Debtor further vigorously opposes the causes of action seeking non-dischargeability.  As discussed supra, Debtor is pursuing an appeal of the Judgment.  If the Judgment is reversed, there would be no current basis for any claim to be deemed non-dischargeable.  If not, any legitimate allowed claim will be paid in full under the Plan rendering non-dischargeability irrelevant.

On May 24, 2021, the Unatins filed an Amended Complaint [Adv. Proc. ECF No. 29] including seventeen causes of action including (i) eight individual causes of action including

multiple non-dischargeability claims, declaratory relief, breach of contract, contractual indemnity, unjust enrichment, intentional interference with contractual relations, inducing breach of contract, and (ii) nine derivative claims including expulsion of the Debtor from the Company, appointment of a receiver for the Company, breach of fiduciary duty, corporate waste, conversation, unjust enrichment, violation of California Penal Code § 496, requesting an accounting, and non-dischargeability ("Adversary Complaint").  The new complaint primarily asserts four new individual claims, but does not address the issues raised in the Debtor's Motion to Dismiss.

Debtor believes the claims in the Adversary Complaint lack merit and intends to file a motion to dismiss claims in the near term in the Adversary Complaint.

Debtor further vigorously opposes the causes of action seeking non-dischargeability.  As discussed supra, Debtor is pursuing an appeal of the Judgment.  If the Judgment is reversed, there would be no current basis for any claim to be deemed non-dischargeable.  If not, any legitimate allowed claim will be paid in full under the Plan rendering non-dischargeability irrelevant. Debtor intends to contest all of the claims asserted in the Adversary Complaint.

**G.**    **Mediation & Stipulations**

On March 31, 2021, the Debtor, Committee, and Unatins informed the Court that they had agreed to a two-day mediation with the Honorable Scott C. Clarkson, the Mediator.  The Court approved a Stipulation with respect to the mediation on April 6, 2021 [Adversary Proceeding ECF No. 25]  On May 10, 2021, the Debtor filed a Report on the Status of the Mediation [ECF No. 260].  On May 25, 2020, the Debtor filed a second Report on the Status of the Mediation [ECF No. 279].

*First Two Mediation Sessions & Stipulations*

The first two mediation sessions occurred, via Zoom, on April 19, 2021 and April 26, 2021.  During those sessions, the parties made significant progress, discussed plan terms, and reached agreements on critical issues including two stipulations.[14]

---

[14] Subsequent to the mediation, the Unatins have taken the position that they did not agree to the stipulations.

Doc #  DC/19510608v1

First, the "Hong Kong Stipulation" provides a streamlined framework for the collection and use of funds in certain bank accounts located in Hong Kong, which funds exceed $13 million. provides that the Committee shall be appointed as the Estate Representative of the Debtor and the Debtor's estate (the "Estate") with authority to deal with, and to take all actions reasonably necessary to seek to recover the funds in, the Hong Kong Accounts and to pursue investigations into Stephen Lai CPA & Co,[15] to the extent related to recovery of the Hong Kong Funds (as defined below), all with the Debtor's assistance.  Subject to the provisions of the Hong Kong Stipulation, the fees, costs and expenses incurred by the Committee, including, without limitation, fees, costs and expenses of counsel, financial advisors and any Hong Kong representatives and advisors retained by the Committee, in seeking to recover the Hong Kong Funds (the "Committee HK Fees and Expenses"), shall be borne by the Estate, subject to reimbursement terms for Ms. Unatin.  Ms. Unatin's reimbursement obligation for fees and expenses in seeking the return of the Hong Kong Funds is limited to $250,000 payable out of the returned funds if she honors her obligation to adhere to the stipulation, or the Bankruptcy Court's decision regarding the assessment of fees against Dikla's portion of the recovery should she refuse to be bound by the stipulation.

The Hong Kong Stipulation provides that all of the recovered funds shall be used to pay allowed claims of the IRS and the California Franchise Tax Board that have priority under section 507(a)(8) of the Bankruptcy Code (the "Priority Tax Obligations") by applying such recovered funds to the next distributions that would be payable under the Plan on account of such claims.

Second, the "Information Sharing Stipulation" provides that Steve Green of KGI Advisors, Inc., financial advisor to the Committee, will be the clearinghouse for information to be supplied to the Unatins.[16]  Gary Howard of Howard, Kittle & Company CPAs, LLP is the person responsible for assembling information requested by Steve Green and shall be directed to so

---

[15] Stephen Lai CPA & Co. was involved in the initial establishment and funding of the Hong Kong Accounts.

[16] The Unatins already have access to a wide range of information, including reports generated by the Company's accountant and view access to the Company's bank account.  This stipulation was a response to the Unatin's complaint that they do not receive information critical to making an offer and evaluating offers for the Company, a contention with which the Debtor disagrees.

comply. The Unatins may request of Steve Green financial information for the two years preceding the date hereof that is relevant to formulation of a financial proposal with respect to an offer for the Company. To the extent that the Unatins contest Mr. Green's decision to not provide certain information, or if any other issue arises hereunder, any of the parties hereto may bring such issue before the Mediator for a binding decision. All information shall be supplied to the Unatins pursuant to a mutually acceptable Non-Disclosure Agreement and shall be limited to the purposes set forth in the Information Sharing Stipulation. As set forth above, in the event that the Unatins do not wish to execute the Information Sharing Stipulation, it shall be of no force or effect as it relates to them.

On May 3, 2021, the Debtor filed a Motion [ECF No. 242] seeking approval of the Hong Kong Stipulation and the Information Sharing Stipulation. On May 17, 2021, the Unatins and US Trustee objected to approval of the Hong Kong Stipulation and the Information Sharing Stipulation [ECF Nos. 266 & 268]. A hearing is set for June 16, 2021.

### *Third and Fourth Mediation Sessions & Stipulations*

On May 6, 2021 and May 17, 2021, the Debtor and Committee attended further mediation sessions with the Mediator. During those sessions, material Plan changes by the Debtor, including a two-year reduction in the length of the Plan, appointment of a Plan Monitor, adjustments to the backstop financing, changes related to the Hong Kong funds, options for the Unatins to obtain any relevant information and participate in a sale of the Company, and detailed mechanics of how a sale should be conducted if the Unatins agreed to a sale process were discussed and agreed to. Unfortunately, the Unatins refused to attend the third and fourth mediation sessions. On May 10, 2021, the Debtor filed a Report on the Status of the Mediation [ECF No. 260]. On May 25, 2020, the Debtor filed a second Report on the Status of the Mediation [ECF No. 279].

### H.    Order to Show Cause

On March 31, 2021, the Court, *sua sponte*, entered an Order [ECF No. 189] to show cause why a chapter 11 trustee should not be appointed in this case. In light of the anticipated mediation

Doc #  DC/19510608v1

1   (described below), the court set the hearing for June 30, 2021 to give the parties time to resolve

2   disputes.

3          On April 28, 2021, two days after the second mediation session, the Unatins filed a

4   Motion [ECF No. 226] requesting that the hearing be expedited to May 19, 2021 (or earlier).  The

5   Debtor and Committee opposed that request and the Court set the hearing for June 8, 2021.

6          On May 25, 2021, the Debtor filed a Response [ECF No. 280] to the Order to Show Cause

7   opposing appointment of a chapter 11 trustee.

8          The Committee also filed a Response [ECF No. 284] to the Order to Show Cause

9   opposing appointment of a chapter 11 trustee.  The Committee argued that the underlying

10  Amended Judgment was not final and could not form a basis for appointment of a trustee.  The

11  Committee further asserted that it was very active in the case, had conducted an investigation and

12  prepared a "Report" (discussed below) regarding the Debtor's assets and liabilities, prepetition

13  transactions, Plan projections, and secured claims.  The Committee opposed a trustee because

14  the Debtor had not engaged in any transactions or activities during the Chapter 11 case or in the

15  months preceding same that were improper or justified a trustee.  The Committee also noted that

16  the Debtor had negotiated in good faith regarding the terms of the Plan and was very cooperative

17  in supplying information to the Committee.  The Committee also opposed appointment of a

18  trustee because a trustee would likely cause a significant diminution of value and that it was not

19  in the best interests of creditors for a trustee to be appointed.

20  I.    **<u>Committee Investigation & Plan Negotiations</u>**

21         Since the formation of the Committee, the Debtor has worked with the Committee to

22  negotiate the terms of the Plan.

23         The Debtor also worked with the Committee to facilitate an investigation of a wide range

24  of matters concerning the Debtor, including an investigation of the Debtor's amounts and values

25  in the Debtors' schedules with respect to assets and liabilities, secured claims against the Debtor,

26  the projections in the Debtor's plan, and the pre-petition transactions. The investigation included

27  obtaining substantial information from the Debtor and the Debtor's professionals, as well as

28  interviews with the Debtor, Debtor's professionals, and creditors of the estate.  The Committee

filed its report on May 25, 2021 [ECF No. 284].  The Committee has concluded that: (i) the amounts and values on the Debtor's schedules with respect to the assets and liabilities that are the subject of the Report are reasonable; (ii) secured claims are supported in the amounts scheduled and secured with the stated collateral; (iii) the Debtor's plan projections are reasonable; and (iv) the prepetition transactions that are the subject of the Report were made for reasonably equivalent value.

**J.    Fee Applications**

On May 10, 2021, the Unatins objected to the fee applications filed by the Debtor's professionals, including (i) Steptoe & Johnson, LLP, (ii) Force Ten Partners, LLC, (iii) Hueston Hennigan LLP, (iv) Holland & Hart LLP, (v) Theodora Oringher PC.  The matter will be heard on July 28, 2021.

**IV.**

**THE PLAN**

THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERRED TO THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS. HOLDERS OF CLAIMS AGAINST DEBTOR AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN

1   INFORMED JUDGMENT CONCERNING THE PLAN. CAPITALIZED TERMS USED IN

2   THIS SUMMARY THAT ARE NOT OTHERWISE DEFINED IN THE DISCLOSURE

3   STATEMENT SHALL HAVE THE MEANINGS USED IN THE PLAN.

4   **A.    Classification and Treatment of Claims Under the Plan**

5         One of the key concepts under the Bankruptcy Code is that holders of "Allowed" claims

6   may receive distributions under a chapter 11 plan. The term "Allowed" is used throughout the

7   Plan and in the descriptions below. In general, an "Allowed" claim simply means that the Debtor

8   agrees (or the Bankruptcy Court has ruled) that the claim, including the amount of the Claim, is

9   in fact, a valid obligation of the Debtor.

10        The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter

11  11 plan divide the different claims against the debtor into separate classes based upon their legal

12  nature. Claims of substantially similar legal nature are usually classified together. Because an

13  entity may hold multiple claims that give rise to different legal rights, the "claims" themselves,

14  rather than their holders, are classified.  Secured Claims have each been separately classified

15  because each secured creditor has a lien on different assets and each claim arises from different,

16  distinct business relationships.  Claims in Class 2A, 2B, and 2C are recourse obligations that

17  arise from ongoing business relationships, each of which is secured by distinct collateral.  Class

18  2F is a nonrecourse obligation that arises from an ongoing consensual business relationship and

19  is secured by distinct collateral.  Classes 2D and 2E are claims that arise from a judgment and

20  judgment liens which are secured by collateral that is distinct from the Collateral securing Claims

21  in Classes 2A, 2B, 2C, and 2F.  There is no ongoing relationship in connection with Claims in

22  Classes 2D and 2E.  Debtor does not believe there are any other Claims that would be classified

23  in Class 2G.  Similarly, Unsecured Claims have been placed into two separate classes, Classes

24  3A and 3B, which consist of all Unsecured Claims.  Claims in Class 3B arise from consensual

25  agreements and ongoing relationships which the Debtor requires be maintained for his future

26  business and investments.  Class 3A Claims are not similar to Class 3B Claims, because, among

27  other reasons, Class 3A Claims arise from a judgment and there is not an ongoing relationship

28  that the Debtor needs to maintain to continue his business and investments.

Doc #  DC/19510608v1

Under a chapter 11 plan, the separate classes of claims must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan (unless the plan has deemed the class to reject the plan), and the right to receive under the chapter 11 plan, no less value than the holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code. Pursuant to section 1124 of the Bankruptcy Code, a class of claims is "impaired" unless the plan (a) does not alter the legal, equitable, and contractual rights of the holders or (b) notwithstanding any contractual provision or applicable law that entitles the holder to receive accelerated payment, the plan cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case, or non-performance of a nonmonetary obligation), reinstates the maturity of the claims in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights, and does not otherwise alter their legal, equitable, and contractual rights. Typically, this means the holder of an unimpaired claim will receive on the later of the effective date of the plan and the date on which amounts owing are due and payable, payment in full, in cash, with post-petition interest to the extent provided under the governing agreement (or if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with their terms. Thus, other than the right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the chapter 11 case not been commenced, such as payment in full in cash on the Effective Date or as soon thereafter as practicable.

Consistent with these requirements, as described in Article I.B. above, the Plan divides the Allowed claims against the Debtor into four distinct classes. Pursuant to the Bankruptcy Code, not all classes are entitled to vote on the Plan. Under the Plan: (i) only Classes 2A to 2C, 2F, 2G and 3A to 3B are impaired and the holders of claims in such classes are entitled to vote to accept or reject the Plan and (ii) Class 1, Class 2D, and Class 2E are unimpaired and the holders of claims in such classes are conclusively presumed to have accepted the Plan and are thus not entitled to vote on the Plan.

**B.      Acceptance or Rejection of the Plan; Effect of Rejection of Plan**

Article V of the Plan sets forth certain rules governing the tabulation of votes under the Plan. These rules include that: (i) if no holders of claims eligible to vote in a particular class actually vote to accept or reject the Plan, the class will be deemed to accept the Plan (Article 5.2) and (ii) if there are no holders of claims that are eligible to vote in any particular class, the class shall be deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan (Article 5.3).

**C.      Plan Distributions**

Article VII of the Plan sets forth the mechanics by which Plan Distributions will be made. Article VII provides, among other things, that: (i) Plan Distributions will be made by the Debtor (Article 7.1); (ii) for tax purposes, Plan Distributions will be treated as first satisfying the principal amount of recipients' claims (rather than interest on such claims) (Article 7.2); (iii) Holders of Priority Tax Claims, and Claims in Classes 1, 2A to 2C, 2F, 2G, and 3A and 3B shall be entitled to Interest at the Applicable Interest Rate as set forth herein.  Other than with respect to the Applicable Interest Rate, holders of Claims shall generally not be entitled to post-petition interest on such claims (except as otherwise set forth in the Plan) (Article 7.3); (iv) Plan Distributions will generally occur on the Semi-Annual Distribution Dates or as soon as possible thereafter (Article 7.4) unless otherwise specified in the Plan; (v) Plan Distributions will be made based on the records of the Debtor as of the close of business on the Distribution Record Date (the earlier of (i) the date of commencement of the Confirmation Hearing or (ii) the date the Bankruptcy Court established as the deadline for the filing of proofs of claim by non-governmental entities in this chapter 11 case) (Article 7.5); (vi) Plan Distributions will be made to applicable Claim holders at the addresses reflected in the Debtor's books and records or other written notice of changes to such addresses (including in proofs of claim) (Article 7.6); (vii) property distributable under the Plan on account of a claim that is not claimed within six (6) months from the date that is ten (10) Business Days from the date of distribution shall revert to the Estate or Reorganized Debtor (or his successors or assigns), as the case may be (Article 7.7); (viii) Plan Distributions shall be in complete settlement, satisfaction, and discharge of Allowed

Claims to the fullest extent permissible under the Bankruptcy Code, including section 1141 of the Bankruptcy Code (Article 7.8); (ix) cash payments may be made by check or wire transfer or otherwise in accordance with applicable  agreements or the Debtor's customary practices (Article 7.9); (x) no holder of a claim shall receive Plan Distributions in excess of the Allowed amount of such claim (Article 7.10); (xi) the Estate or Reorganized Debtor shall be entitled to exercise certain rights of setoff or recoupment with respect to Plan Distributions, and holders of claims seeking to assert rights of recoupment or setoff shall be required to provide written notice of such rights in advance of the Effective Date (Article 7.11); (xii) the Estate or Reorganized Debtor will be authorized to take any and all actions that may be necessary or appropriate to comply with tax withholding and reporting requirements, including liquidating any portion of any Plan Distribution to generate sufficient funds to pay withholding taxes and/or requiring holders of claims to submit appropriate tax and withholding certifications (Article 7.12); (xiii) claims will be reduced and Disallowed to the extent that holders of such claims have received payment (before or after the Effective Date) from a party other than the Debtor, Estate, or Reorganized Debtor or through the exercise of setoff or recoupment rights (Article 7.13(a)); (xiv) Plan Distributions will be made in accordance with the provisions of any applicable insurance policy of the Debtor (Article 7.13(b)); and (xv) provides for a Plan Monitor to oversee and monitor the Debtor's compliance with the terms of the Plan (Article 7.14).

**D.    Sources of Cash for Plan Distributions**

Article 6.2 of the Plan provides that except as otherwise provided in the Plan or Confirmation Order, all cash required for payments to be made hereunder shall be funded from the Debtor's Cash balances, future income and earnings, borrowings, recurring cash distributions from investments, cash distributions on account of liquidity events (*e.g.,* a financing, acquisition, merger, initial public offering or other event that allows investors the ability to cash out some or all of their ownership interests) involving the businesses in which the Debtor holds investments, or the sale of any of the Debtor's other assets.  Additionally, the Debtor will have access to a $30 million Plan Backstop permitting the Debtor to borrow up to $30 million for payment of obligations due under a plan of reorganization to the extent of any shortfall of Borrower

Doc #  DC/19510608v1

1  thereunder.  If a Plan Option is elected in a Plan Election, the Debtor shall obtain financing

2  providing sufficient liquidity to satisfy the obligations of such Plan Option prior to the Effective

3  Date.  Attached hereto are financial projections, **Exhibit C** (Financial Projections), reflecting the

4  cash inflows and outflows during the Plan Period, as described above.

5  **E.    Preservation of Claims and Rights to Settle Claims**

6          Article 8.3 of the Plan provides that except where such Causes of Action or Claims have

7  been expressly released in the Plan (including as set forth in Article 11.4(a) of the Plan), in

8  accordance with section 1123(b) of the Bankruptcy Code, the Estate or Reorganized Debtor, as

9  applicable, shall retain and may enforce all rights to commence and pursue, as appropriate, any

10  and all Causes of Action and/or Claims, including those listed on **Exhibit A to the Plan**

11  ("Retained Actions"), whether arising before or after the Petition Date and the Reorganized

12  Debtor's rights to commence, prosecute or settle such Causes of Action of Claims shall be

13  preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action

14  or Claims released by the Debtor pursuant to the releases and exculpations contained in Article

15  11.4(a) of the Plan, which shall be deemed released and waived by the Debtor, Estate's and

16  Reorganized Debtor as of the Effective Date.  The Estate or Reorganized Debtor, as applicable,

17  shall be entitled to assert all such Claims or Causes of Action, including Retained Actions, and

18  may enforce, sue on, settle, compromise, otherwise resolve, discontinue, abandon, or dismiss any

19  and all Claims or Causes of Action, including Retained Actions, counterclaims, defenses, and

20  rights (including setoff rights) including those that may be asserted in the Claims or Causes of

21  Action, objections, suits, and proceedings,  whether at law or in equity, whether known or

22  unknown, that the Debtor or his Estate may hold against any Entity and all of the Debtors' legal

23  and equitable rights in respect of any Claim or Cause of Action, including the Retained Actions,

24  may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not

25  been commenced, provided that any proceedings related to such Claims or Causes of Action may

26  be brought in the Bankruptcy Court and that causes of action that arise under the Bankruptcy

27  Code may also be pursued, without the approval of the Bankruptcy Court.

28

The Plan provides that the Estate or Reorganized Debtor, as the case may be, expressly reserves all rights to prosecute any and all Retained Actions against any Entity. Unless any Retained Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Estate or Reorganized Debtor expressly reserves all Retained Actions for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches shall apply to limit the Debtor's positions with respect to such Retained Action upon, after, or as consequence of, confirmation or consummation of the Plan. Any proceeds received on account of any Retained Action shall be retained by the Estate or Reorganized Debtor, as applicable, and may be used for the payment of Claims in accordance with the Plan.

## F.    Procedures for Resolving Disputed Claims

Article VIII of the Plan governs the resolution of Disputed Claims. Pursuant to Article 8.1 of the Plan, only the Debtor, Estate, or Reorganized Debtor will be entitled to object to claims after the Effective Date, and any such objections must be filed and served within one hundred eighty (180) days after the Effective Date (or, if later, the date that the proof of claim to which the Debtor, Estate, or Reorganized Debtor objects is asserted or amended in writing), or such later deadline as may be fixed by the Bankruptcy Court. The Estate or Reorganized Debtor, as applicable, may also seek to estimate any contingent or unliquidated claims pursuant to section 502(c) of the Bankruptcy Code. Article 8.2 of the Plan provides that no distributions shall be made on account of Disputed Claims unless and until such Disputed Claims become Allowed and that prior to a Claim becoming an Allowed Claim, any payments that would be made under the Plan on account of such Claim shall instead be deposited in a segregated account ("Disputed Claims Reserve") at such time and in such amounts as they would otherwise be paid to the holder of such Claim if such Claim were an Allowed Claim.

The Debtor and, after the Effective Date, the Estate or Reorganized Debtor, as applicable shall be authorized to submit, on behalf of the Bankruptcy Estate, prompt audit requests to all applicable tax authorities under section 505(b) of the Bankruptcy Code (and under any other

applicable section(s) of the Bankruptcy Code) for all tax periods during which the Bankruptcy Estate is in existence, commencing with the date of the filing of the bankruptcy petition and ending with the date on which the Bankruptcy Estate terminates pursuant to Article 11.1 of the Plan. Similarly, the Debtor and, after the Effective Date, the Estate or Reorganized Debtor, as applicable, shall be authorized to seek, on behalf of the Bankruptcy Estate,  an expedited determination in the Bankruptcy Court of whether the Estate owes any taxes under any applicable sections of the Bankruptcy Code under section 505(a) of the Bankruptcy Code (and under any other applicable section(s) of the Bankruptcy Code) for all tax periods during which the Bankruptcy Estate is in existence, commencing with the date of the filing of the bankruptcy petition and ending with the date on which the Bankruptcy Estate terminates pursuant to Article 11.1 of the Plan. The Bankruptcy Court shall retain jurisdiction to makes such determinations under Article 13.5 of the Plan.

Article 11.8 of the Plan governs the subordination of claims.  It provides that all subordination rights, whether arising by contract or under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise, are fully preserved and are not released.  Notwithstanding any other provision of this Plan, including any provision purporting to designate a Claim as part of a specific Class, the Debtor shall be entitled to seek subordination of any Claim, by any appropriate process, including by motion or adversary proceeding pursuant to section 510 of the Bankruptcy Code.  Notwithstanding any other provision of the Plan, for purposes of distribution, any distributions that would be made under the Plan on account of a Subordinated Claim shall instead be deposited in a segregated account ("Subordinated Claims Reserve") at such time and in such amounts as they would otherwise be paid to the holder of such Claim if such Claim was not a Subordinated Claim.

To the extent that a Subordinated Claim ultimately becomes a non-Subordinated Claim and is an Allowed Claim, the Debtor shall distribute to the holder of such Allowed Claim the property distributable to such holder pursuant to Article IV of the Plan from the Subordinated Claims Reserve; provided, however, that the timing of distributions to holders of Allowed Claims shall be governed in all respects by Article VII of the Plan.  To the extent that a Subordinated

Doc #  DC/19510608v1

1 Claim is an Allowed Claim and Subordinated Claim, the Debtor shall distribute to the holder of

2 such Subordinated Claim the property distributable to such holder pursuant to Article IV of the

3 Plan from the Subordinated Claims Reserve only after the Holders of each non-Subordinated

4 Claims receive the full value of each of their Allowed Claims plus Interest at the Applicable

5 Interest Rate, provided, however, that the timing of distributions to holders of Allowed Claims

6 shall be governed in all respects by Article VII of the Plan.  Notwithstanding anything to the

7 contrary in this Plan, to the extent that all or a portion of a Subordinated Claim is Disallowed,

8 the holder of such Claim shall not receive any distribution on account of the portion of such

9 Claim that is Disallowed, with such amounts to revest in the Estate or Reorganized Debtor, as

10 the case may be.

11 **G.    Executory Contracts and Unexpired Leases**

12 Article IX of the Plan governs the treatment of the Debtor's executory contracts and

13 unexpired leases. Article 9.1 of the Plan provides that all executory contracts and unexpired

14 leases of the Debtor listed on **Exhibit B** to the Plan (Schedule of Contracts and Leases to be

15 Assumed Under the Plan) of the Plan will be deemed assumed on the Effective Date (subject to

16 payment of applicable Cure Amounts), except that: (a) any executory contracts and unexpired

17 leases that previously have been assumed or rejected pursuant to a Final Order of the Bankruptcy

18 Court shall be treated as provided in such Final Order; (b) any executory contracts and unexpired

19 leases listed on the **Exhibit C** to the Plan (Schedule of Rejected Contracts and Leases), shall be

20 deemed rejected as of the Effective Date; and (c) all executory contracts and unexpired leases

21 that are the subject of a separate motion to assume or reject under section 365 of the Bankruptcy

22 Code pending on the Effective Date shall be treated as provided for in the Final Order resolving

23 such motion.

24 Pursuant to Article 9.2 of the Plan, claims arising from the rejection of executory contracts

25 or unexpired leases will be treated as General Unsecured Claims, solely to the extent evidenced

26 by a proof of claim filed and served upon counsel for the Debtor, Estate, and Reorganized Debtor

27 within sixty (60) days after the later of (a) the date of entry of an order of the Bankruptcy Court

28 approving such rejection, or (b) the Confirmation Date.

Article 9.3 of the Plan governs the establishment and payment of Cure Amounts. In general, the Debtor's proposed Cure Amounts for each executory contract or unexpired lease to be assumed will be set forth on a Cure Schedule to be filed and served on the counter-party to such executory contract or unexpired lease no later than ten (10) calendar days prior to the Confirmation Hearing. The proposed Cure Amounts shall become binding on the counterparties if they fail to object to the proposed Cure Amount within ten (10) calendar days of the filing and service of the Cure Schedule. If a counterparty does timely object to the proposed Cure Amount or the Debtor's proposed assumption of its contract generally, the Bankruptcy Court will enter an order resolving the dispute (if not resolved consensually by the parties). If the only issue raised in any such dispute is the Cure Amount, the Debtor will be authorized to assume the executory contract or unexpired lease that is the subject of such dispute so long as they reserve an amount of cash sufficient to pay the counterparty's asserted Cure Amount. Cure Amounts will generally be paid in full in cash within thirty (30) days after the Effective Date or the date on which any dispute pertaining to the proposed assumption has been resolved (whichever is later).

Article 9.4 of the Plan provides that all insurance policies of the Debtor under which the Debtor has outstanding obligations as of the Effective Date will be treated as assumed executory contracts, and all other insurance policies of the Debtor will vest in the Estate or Reorganized Debtor, as the case may be. Pursuant to Article 9.7 of the Plan, all contracts and leases entered into by the Debtor after the Petition Date will survive and be unaffected by entry of the Confirmation Order.

Article 9.5 of the Plan contains certain reservations of rights by the Debtor concerning executory contracts and unexpired leases, including a reservation of the Debtor's rights to amend the Schedule of Rejected Contracts and Leases and Schedule of Contracts and Leases to be Assumed Under the Plan until and including the Effective Date. Article 9.6 of the Plan clarifies that rejection of any executory contract or unexpired lease under the Plan will not constitute a termination of pre-existing obligations owed to the Debtor under such contracts or leases (including any continuing obligations of counterparties to provide warranties or continued maintenance obligations on goods previously purchased by the Debtor).

Doc # DC/19510608v1

**H.    Dissolution of Statutory Committees and Cessation of Fee and Expense Payment.**

On the Effective Date, any statutory committee(s) appointed in the Chapter 11 Case, including the Committee, shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Case. The Reorganized Debtor shall not be responsible for paying any fees and expenses incurred after the Effective Date, if any, by the professionals retained by any such committee, other than for the reasonable fees and expenses for the services authorized to be provided pursuant to Article 13.4 of the Plan.

**I.    Discharge, Release, Injunctive, and Exculpatory Provisions of the Plan**

Article XI of the Plan sets forth the effects and consequences of confirmation of the Plan, including the vesting of the assets of the Debtor in the Estate or Reorganized Debtor, as the case may be (Article 11.1), the binding effect of the Plan on holders of claims (Article 11.2), the discharge of claims under the Plan (Article 11.3), the preservation of injunctions or stays provided for in the chapter 11 case through the Final Payment Date or such earlier date as ordered by the Bankruptcy Court or agreed to by the parties to an underlying proceeding, provided that such stays and injunctions shall be lifted for the limited purpose of the appeal of the Litigation (Article 11.7), the subordination of claims (Article 11.8),  and the Debtor's reservation of rights in the event that the Effective Date does not occur (Article 11.09).

**In addition, Articles 11.4, 11.5, and 11.6 of the Plan contain important releases, injunctions, and exculpatory provisions. These provisions are highlighted below.**

**1.    Discharge of Claims**

**PLEASE TAKE NOTICE THAT THE DEBTOR SEEKS A DISCHARGE PURSUANT TO SECTION 1141(D)(5) OF THE BANKRUPTCY CODE AS OF THE FINAL PAYMENT DATE, WHICH WILL RESULT IN CREDITORS BEING ENJOINED FROM TAKING ANY ACTION TO COLLECT, RECOVER OR OFFSET ANY CLAIM AS A PERSONAL LIABILITY OF THE DEBTOR.**

**Article 11.3 of the Plan provides that, pursuant to and as provided in  section 1141 of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and**

Doc #  DC/19510608v1

subject to section 1141 of the Bankruptcy Code, the distributions, rights, and treatment that are provided in the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims against the Debtor of any nature whatsoever, whether known or unknown, or against the assets or properties of the Debtor that arose before the Effective Date. Except as expressly provided in the Plan and subject to section 1141 of the Bankruptcy Code, on the Discharge Date (and subject to its occurrence), and pursuant to section 1141(d)(5)(A) of the Bankruptcy Code, the Order approving Debtor's discharge ("Discharge Order"), shall be deemed to act as a discharge and release under section 1141(d)(1)(A) of the Bankruptcy Code of all Claims against the Debtor and his assets, arising at any time before the Effective Date, regardless of whether a proof of Claim was filed, whether the Claim is Allowed, or whether the holder of the Claim votes to accept the Plan or is entitled to receive a distribution under the Plan. Any default by the Debtor with respect to any Claim that existed immediately prior to or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date.

Except as expressly provided in the Plan and subject section 1141 of the Bankruptcy Code, any holder of a discharged Claim will be precluded from asserting against the Debtor or any of his assets any other or further Claim based on any document, instrument, act, omission, transaction, or other activity of any kind or nature that occurred before the Effective Date. Except as expressly provided in the Plan and subject to section 1141 of the Bankruptcy Code, pursuant to section 1141(d)(5)(A), the Discharge Order will be a judicial determination of discharge of all liabilities of the Debtor to the extent allowed under section 1141 of the Bankruptcy Code, and the Debtor will not be liable for any Claims and will only have the obligations that are specifically provided for in the Plan.

By voting to accept the Plan, you are voting to accept the discharge of Debtor provided for in the Plan.

2.    Releases

PLEASE TAKE NOTICE THAT ARTICLE 11.4(b) OF THE PLAN (*RELEASES BY HOLDERS OF GENERAL UNSECURED CLAIMS, JUDGMENT CLAIMS, AND*

*SECURED CLAIMS*) CONTAINS A THIRD-PARTY RELEASE. YOU ARE DEEMED TO GRANT A THIRD-PARTY RELEASE IF YOU ARE A HOLDER OF A GENERAL UNSECURED CLAIM, JUDGMENT CLAIM, OR SECURED CLAIM THAT EITHER: (I) VOTES TO ACCEPT THE PLAN OR (II) IS CONCLUSIVELY DEEMED TO HAVE ACCEPTED THE PLAN. IN ADDITION, IN ACCORDANCE WITH SECTION 524(a)(3) OF THE BANKRUPTCY CODE. IF YOU VOTE TO ACCEPT THE PLAN, YOU SHALL BE DEEMED TO HAVE CONSENTED TO THE PLAN'S THIRD-PARTY RELEASE AND ANY ELECTION YOU MAKE TO NOT GRANT THE RELEASE WILL BE INVALIDATED.  IF (1) YOU DO NOT VOTE TO ACCEPT OR REJECT THE PLAN OR (2) VOTE TO REJECT THE PLAN, YOU MAY IN ANY EVENT VOLUNTARILY ELECT TO OPT IN TO THE THIRD-PARTY RELEASE.  YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

The following definitions are essential to understanding the scope of the releases being given under the Plan.

The Plan defines "**Causes of Action**" to mean any action, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law, or in equity, or pursuant to any other theory of law. For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any Claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any equitable remedy, including, without limitation, any Claim for equitable subordination, equitable disallowance, or unjust enrichment; (e) any Claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the

Bankruptcy Code; and (f) any cause of action or Claim arising under any state or foreign fraudulent transfer law.

The Plan defines "**Released Parties**" to mean, collectively, (a) the Debtor and the Estate; (b) all Persons engaged or retained by the Debtor in connection with the Chapter 11 Case (including in connection with the preparation of and analyses relating to the Disclosure Statement and the Plan); (c) the Committee; (d) each of the Committee's current and former members (solely in their capacity as members of the Committee); and (e) any and all advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, consultants and representatives of each of the foregoing Persons and Entities (whether current or former, in each case in his, her, or its capacity as such for the Debtor or Committee, as applicable).  Each of the Released Parties shall separately be a Released Party.  Notwithstanding the foregoing or any other provision in this Plan or the Confirmation Order, none of Dikla Unatin, Dean Unatin, or any or their advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, consultants or representatives shall be a Released Party or Released Parties and no claims against any of them shall be released.

The Plan defines "**Releasing Parties**" to mean, collectively, and each solely in its capacity as such: (a) each Released Party; (b) each Holder of a Claim that votes to accept the Plan, and (c) each Holder of a Claim that votes to reject the Plan or does not vote to accept or reject the Plan but, in either case, affirmatively elects to "opt in" to the releases provided in the Plan, including section 11.4(b) of the Plan.

a.    *Releases by the Debtor*

**Article 11.4(a) of the Plan provides that, upon the Effective Date, to the maximum extent permitted by applicable law, including sections 524(e) and 1141 of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, in his individual capacity and as debtor in possession, shall be deemed forever to release, waive, and discharge (x) all Persons engaged or retained by the Debtor in connection with the Chapter 11 Case (including in connection with the preparation of and analyses relating to the Disclosure Statement and the Plan); (y) the Committee and each of**

the Committee's current and former members (solely in their capacity as members of the Committee) and (z) any and all advisors, attorneys, actuaries, financial advisors, accountants, investment bankers, agents, professionals, consultants and representatives of each of the foregoing Persons and Entities (whether current or former, in each case in his, her, or its capacity as such), from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action, and liabilities, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws (other than the rights of the Debtor, Estate, or Reorganized Debtor to enforce the terms of the Plan and the contracts, instruments, releases, and other agreements or documents delivered in connection with the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event or other occurrence, or circumstances taking place on or before the Effective Date, in any way relating to (i) the Debtor or the Chapter 11 Case; (ii) any action or omission of any Released Party with respect to any indebtedness under which the Debtor is or was a borrower or guarantor; (iii) any Released Party in any such Released Party's capacity as an employee, or agent of, or advisor to, or consultant to, the Debtor; (iv) the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan; (v) the business or contractual arrangements between the Debtor and any Released Party; (vi) the restructuring of Claims before or during the Chapter 11 Case; and (vii) the negotiation, formulation, preparation, or dissemination of the Plan (including, for the avoidance of doubt, the Plan Supplement), the Disclosure Statement, or related agreements, instruments, or other documents, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order to have constituted willful misconduct, fraud, or gross negligence. The Reorganized Debtor shall be bound, to the same extent the Debtor is bound, by the releases and discharges set forth above.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party that is owed to the Debtor

Doc #  DC/19510608v1

under the Plan or otherwise or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or preserved or assumed by or through the Plan or prior Court order.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article 11.4(a) by the Debtor, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute its finding that each release described in this Article 11.4(a) is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the non-Debtor Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

        b.    *Releases by Holders of General Unsecured Claims, Judgment Claims and Secured Claims.*

Article 11.4(b) of the Plan provides that, on the Effective Date, to the maximum extent permitted by applicable law, including sections 524(e) and 1141 of the Bankruptcy Code, each non-Debtor Releasing Party, in consideration for the obligations of the Debtor, Estate, and the Reorganized Debtor under the Plan, and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed forever to release, waive, and discharge the Released Parties from personal liability in every jurisdiction from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, remedies, actions, Causes of Action, and liabilities whatsoever, whether for tort, fraud, contract, recharacterization, subordination, violations of federal or state securities laws or laws of any other jurisdiction or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then-existing or thereafter arising, at law, in equity, or otherwise, based in whole or in part on any act, omission, transaction, event, or other occurrence, or

Doc # DC/19510608v1

1  circumstances taking place on or before the Effective Date, in any way relating to (i) the

2  Debtor or the Chapter 11 Case; (ii) any action or omission of any Released Party with

3  respect to any indebtedness under which the Debtor is or was a borrower or guarantor;

4  (iii) any Released Party in any such Released Party's capacity as an employee, agent of, or

5  advisor to, or consultant to, the Debtor; (iv) the subject matter of, or the transactions or

6  events giving rise to, any Claim that is treated in the Plan; (v) the business or contractual

7  arrangements between the Debtor and any Released Party; (vi) the restructuring of Claims

8  before or during the Chapter 11 Case and the solicitation of votes with respect to the Plan;

9  and (vii) the negotiation, formulation, preparation, entry into, or dissemination of the Plan

10  (including, for the avoidance of doubt, the Plan Supplement and all documents contained

11  or referred to therein), the Disclosure Statement, or related agreements, instruments, or

12  other documents, other than claims or liabilities arising out of or relating to any act or

13  omission of a Released Party that is determined by a Final Order to have constituted willful

14  misconduct, fraud, or gross negligence. Notwithstanding anything contained herein to the

15  contrary, the foregoing release does not release any obligations of any party that is owed to

16  the Debtor under the Plan or otherwise or any document, instrument, or agreement

17  (including those set forth in the Plan Supplement) executed to implement the Plan or

18  preserved or assumed by or through the Plan or prior Court order.

19  In connection with the releases described in this Article 11.4(b), each non-Debtor

20  Releasing Party shall waive all rights conferred by the provisions of section 1542 of the

21  California Civil Code and/or any similar state or federal law. Section 1542 of the California

22  Civil Code provides as follows: "A GENERAL RELEASE DOES NOT EXTEND TO

23  CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN

24  HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF

25  KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER

26  SETTLEMENT WITH THE DEBTOR."

27  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval,

28  pursuant to Bankruptcy Rule 9019, of the releases described in this Article 11.4(b), which

Doc # DC/19510608v1

includes by reference each of the related provisions and definitions contained in the **Plan**, and further, shall constitute its finding that each release described in Article 11.4(b) is: (i) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such claims; (ii) in the best interests of the Debtor and all holders of Claims; (iii) fair, equitable, and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the non-Debtor Releasing Parties asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

**3.    Exculpation and Limitation of Liability**

Article 11.5 of the Plan provides that to the maximum extent permitted by applicable law, including sections 524(e) and 1141 of the Bankruptcy Code, none of the Debtor, Estate, or Reorganized Debtor, or the direct or indirect affiliates, employees, advisors, attorneys, financial advisors, accountants, investment bankers, agents, consultants, or other professionals (whether current or former, in each case, in his, her, or its capacity as such) of the Debtor, Estate, or the Reorganized Debtor, or the Released Parties, shall have or incur any liability to, or be subject to any right of action by, any holder of a Claim, or any other party in interest in the Chapter 11 Case, or any of their respective agents, employees, representatives, financial advisors, attorneys or agents acting in such capacity, or direct or indirect affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, formulation, negotiation, preparation, dissemination, confirmation, solicitation, implementation, or administration of the Plan, the Plan Supplement and all documents contained or referred to therein, the Disclosure Statement, any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, or any other pre- or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor or confirming or consummating the Plan (including the distribution of any property under the Plan); provided, however, that the foregoing provisions of this Article 11.5 shall have no effect on the liability of any Person

1  or Entity that results from any such act or omission that is determined by a Final Order to

2  have constituted willful misconduct, fraud, or gross negligence and shall not impact the

3  right of any holder of a Claim or any other party to enforce the terms of the Plan and the

4  contracts, instruments, releases, and other agreements or documents delivered in

5  connection with the Plan. Without limiting the generality of the foregoing, the Debtor and

6  the Debtor's direct or indirect affiliates, employees, advisors, attorneys, financial advisors,

7  accountants, investment bankers, agents, consultants, and other professionals (whether

8  current or former, in each case, in his, her, or its capacity as such) shall, in all respects, be

9  entitled to reasonably rely upon the advice of counsel with respect to their duties and

10 responsibilities under the Plan. The exculpated parties have participated in good faith and

11 in compliance with the applicable provisions of the Bankruptcy Code with regard to the

12 solicitation and distribution of the securities pursuant to the Plan, and, therefore, are not,

13 and on account of such distributions shall not be, liable at any time for the violation of any

14 applicable law, rule, or regulation governing the solicitation of acceptances or rejections of

15 the Plan or such distributions made pursuant to the Plan. This exculpation shall be in

16 addition to, and not in limitation of, all other releases, indemnities, exculpations, and any

17 other applicable law or rules protecting such exculpating parties from liability.

18    4.    **Injunctions**

19        *a.    General*

20    Article 11.6(a) of the Plan provides that all Persons or Entities who have held, hold,

21 or may hold Claims (other than Claims that are reinstated under the Plan), and all other

22 parties in interest in the Chapter 11 Case, along with their respective current and former

23 employees, agents, officers, directors, principals, and direct and indirect affiliates, are

24 permanently enjoined, from and after the Effective Date, from, in respect of any Claim or

25 Cause of Action released or settled hereunder, (i) commencing, conducting, or continuing

26 in any manner, directly or indirectly, any suit, action, or other proceeding of any kind

27 (including, without limitation, any proceeding in a judicial, arbitral, administrative, or

28 other forum) against the Released Parties, the Debtor, or the Reorganized Debtor, or in

respect of any Claim or Cause of Action released or settled hereunder; (ii) enforcing, levying, attaching, collecting, or otherwise recovering by any manner or means, whether directly or indirectly, of any judgment, award, decree, or order against the Released Parties or the Reorganized Debtor; (iii) creating, perfecting, or enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the Reorganized Debtor; (iv) asserting any right of setoff, subrogation, or recoupment of any kind, against any obligation due from the Released Parties or the Reorganized Debtor, or against the property or interests in property of the Debtor, Estate, or Reorganized Debtor, on account of such Claims; or (v) commencing or continuing in any manner any action or other proceeding of any kind on account of, in connection with, or with respect to any such Claims released or settled pursuant to the Plan; provided, however, that nothing contained herein shall preclude such Entities from exercising their rights pursuant to and consistent with the terms of the Plan and the contracts, instruments, releases, and other agreements and documents delivered under or in connection with the Plan.

> b.    *Injunction Against Interference With the Plan*

Article 11.6(b) of the Plan provides that upon entry of the Confirmation Order, all holders of Claims and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan. Each holder of an Allowed Claim, by accepting, or being eligible to accept, distributions under or reinstatement of such Claim, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article 11.6 of the Plan.

**J.    Conditions Precedent to Confirmation and the Effective Date**

Article 10.1 of the Plan sets forth the conditions precedent to confirmation of the Plan, which consist of (a) approval of the Disclosure Statement, (b) the Plan Backstop between RJB and Debtor, or a similar such agreement, to the extent required, shall have been approved by the Bankruptcy Court and entered into and shall be in full force and effect, and (c) to the extent a Plan Option is elected, Debtor shall have obtained financing satisfying the requirements for the

Plan Option elected, shall have been approved by the Bankruptcy Court, if required, and shall have been entered into and be in full force and effect.

Article 10.2 of the Plan sets forth the conditions precedent to the Effective Date, which consists of (a) the Confirmation Order becoming a Final Order, (b) the Plan Backstop between RJB and Debtor, or a similar such agreement, shall be in full force and effect, and (c) financing required by a Plan Option that was elected shall be in full force and effect.

Article 10.3 of the Plan provides that, if the conditions listed in Articles 10.1 and 10.2 are not satisfied or waived within 180 days of the Confirmation Order becoming a Final Order, then (a) the Confirmation Order shall be of no further force or effect; (b) the Plan shall be null and void in all respects; (c) no distributions under the Plan shall be made; (d) no executory contracts or unexpired leases that were not previously assumed, assumed and assigned, or rejected shall be deemed assumed, assumed and assigned, or rejected by operation of the Plan; (e) the Debtor and all holders of Claims shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date; and (f) nothing contained in the Plan or the Disclosure Statement shall (i) be deemed to constitute a waiver or release of (x) any Claims belonging to the Debtor, (ii) prejudice in any manner the rights of the Debtor or any other Entity, or (iii) constitute an admission, acknowledgment, offer, or undertaking by the Debtor in any respect.

**V.**

**<u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>**

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

Doc #  DC/19510608v1

THESE RISK FACTORS CONTAIN CERTAIN STATEMENTS THAT ARE FORWARD-LOOKING STATEMENTS. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTOR. IF ANY OF THE FOLLOWING RISKS OR OTHER UNFORESEEN EVENTS ACTUALLY OCCUR, DEBTOR'S INVESTMENTS, THEIR FINANCIAL CONDITION AND THE VALUE OF DEBTOR'S ECONOMIC INTEREST IN THE INVESTMENTS MAY BE MATERIALLY NEGATIVELY AFFECTED. AS A RESULT, THE CASH AVAILABLE FOR DISTRIBUTION ARE ENTIRELY RELIANT ON THE VALUE OF DEBTOR'S INTEREST IN THE INVESTMENTS.  HOLDERS OF CLAIMS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. NO PARTY, INCLUDING, WITHOUT LIMITATION, THE DEBTOR OR THE REORGANIZED DEBTOR, UNDERTAKES AN OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

**A.    Risks Related to the Plan**

***The Plan May Not Be Confirmed.***

There is no assurance that the Bankruptcy Court will confirm the Plan. Even if all classes vote to accept the Plan, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions, if any, holders of claims ultimately would receive with respect to their Allowed Claims.

***Failure to Consummate the Plan.***

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date. As the date of filing this Disclosure Statement, there can be no assurance that any

Doc #  DC/19510608v1

or all of the conditions in the Plan will be satisfied (or waived). Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court. Further, if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

***If the Plan is not consummated, Debtor may seek restructuring alternatives that result in less value to holders of claims against Debtor than they would receive pursuant to the Plan.***

If Debtor does not consummate the Plan, he may be required to pursue an alternative plan or plans of reorganization, either under the Bankruptcy Code or otherwise. There can be no assurance that Debtor would be able to affect any such alternative plan or reorganization or that any such alternative plan or reorganization would be on terms as favorable to the holders of claims against Debtor as the terms of the Plan. In addition, certain of Debtor's creditors may seek relief from the automatic stay to take certain legal actions against Debtor, which could include foreclosure or liquidation of Debtor's assets. If a liquidation or protracted reorganization of Debtor were to occur, there is a substantial risk that the value of Debtor's assets would be substantially eroded to the detriment of all stakeholders. If an alternative plan of reorganization could not be implemented, it is likely that Debtor would have to liquidate his assets, in which case it is likely that holders of claims against Debtor would receive less than they would have received pursuant to the Plan.

***Debtor may withdraw, amend, cancel, or delay the Plan in his sole and absolute discretion.***

To the fullest extent permitted by applicable law, Debtor reserves the right to withdraw, amend, cancel, or delay the Plan (or any part of the Plan), before or after the Voting Deadline. The potential impact of any such action on the holders of claims cannot presently be foreseen but may include a change in the economic impact of the Plan or could make it significantly less likely that Debtor will be able to consummate the Plan. You will not have any right to vote on, or to be consulted in connection with, Debtor's decision regarding whether to withdraw, amend, cancel, or delay the Plan or any part thereof, except to the extent required by applicable law.

***The treatment of accrued but unpaid interest on a Claim is uncertain.***

Holders of Claims who receive distributions under the Plan may have taxable ordinary income equal to the value of the distributions they receive to the extent of any accrued and unpaid

Doc # DC/19510608v1

interest on the debt they hold that is extinguished or retired. Holders of Claims should discuss the potential for interest income and other possible tax consequences with their own tax advisors.

***Allowed Claims May Exceed Good Faith Estimates***

The actual amount of Allowed Claims could be materially greater than anticipated by the Debtor, which will impact the distributions to be made to holders of Claims. Additionally, the Debtor believes that he will be successful in challenging certain of the claims or settling the claims for reduced amounts. These matters will be determined in connection with, among other things, claims objections proceedings. In the event the Debtor is not successful in disallowing (or reducing) some of the disputed claims, the amount of claims may significantly exceed the projections.

***Conditions Precedent to the Effective Date May Not be Satisfied***

The Debtor does not have control over certain conditions precedent to the Effective Date that are set forth in Article 10.2 of the Plan.

***Plan May Not Be Accepted or Confirmed***

While the Debtor believes the Plan will be confirmable under the standards set forth in section 1129 of the Bankruptcy Code, there can be no guarantee that the Bankruptcy Court will agree. Additionally, if no impaired Class entitled to vote on the Plan votes to accept the Plan, the Plan cannot be confirmed without modification.

***Parties in Interest May Object to the Debtor's Classification of Claims***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim in a particular class only if the claim is substantially similar to the other claims in that class. The Debtor believes that the classification of Holders of Claims against the Debtor under this Plan and Disclosure Statement complies with the requirements set forth in the Bankruptcy Code because the Classes established under this Plan and Disclosure Statement each encompass Claims that are substantially similar to similarly classified Claims. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Doc # DC/19510608v1

1    ***The future value of the investments, and therefore the value of assets and cash available for***
2    ***distribution is uncertain. The projected amounts set forth in Exhibit B of this Disclosure***
3    ***Statement are based on estimates and assumptions that may not prove to be accurate.***

4    The projected amounts set forth in the "Liquidation Analysis" attached as **<u>Exhibit B</u>** are

5    estimates only and reflect various assumptions by Debtor in consultation with the Debtor's

6    financial advisors. Such estimates and assumptions are considered reasonable by Debtor and the

7    Debtor's financial advisors, although they may prove to have been incorrect or unfounded;

8    further, they are estimates only and are inherently subject to significant economic, competitive,

9    tax, and other risks and uncertainties beyond the control of Debtor. There can be no assurance

10    that the projected returns described in such will be realized, and actual results may vary materially

11    and adversely from the estimates set forth therein. To the extent the future value of the

12    investments is materially less than described in the table, the value there may be less assets

13    available to pay claims than anticipated.

14    There is a risk if a Trustee is appointed that the Plan may not be confirmable without

15    modification, including decreased payments to creditors, as the Plan Backstop and any other

16    financing required by a Plan Option will not be available.

17    To the extent that the Adversary Proceeding results in claims in excess of the Debtor's

18    ability to pay (inclusive of Company funds available to indemnify the Debtor), or exceeds his

19    ability to obtain additional financing, the Plan may not be confirmable without modification,

20    including decreased payments to creditors.

21    **B.    Risks Related to the Company**

22    Debtor does not anticipate any distributions from the Company other than (i) distributions

23    for the payment of taxes during the Plan period, (ii) Company OVDP Distribution (and the

24    Debtor's Share of the Company OVDP Distribution), and (iii) in connection with a Plan Election

25    selecting Plan Option 3, and Debtor will retain his interest in the Company.  However,

26    distributions on account of Debtor's interest in the Company or reimbursement or

27    indemnification of the Debtor's expenses in defending himself in the adversary proceeding, could

28

Doc # DC/19510608v1

provide potential further backstops in the event the Debtor's Investments and the $30 million Plan Backstop are insufficient to make Plan Distributions.

**C.    Risks Related to the Investments**

***The value of the investments which will be used to make payments under the Plan are not certain.***

***Recoveries and the Timing of Cash Availability***

The Debtor's ability to make distributions on account of Allowed Claims depends largely on the Debtor's ability to monetize his Private Investments and other assets, as well as the Plan Backstop.  There is always a risk that the value of such investments will be lower than expected or the underlying assets held by the entities will be sold for less than expected.

In addition, the Debtor has attempted to provide a reasonable basis for estimating the tax impact that would be triggered by distributions on account of such Private Investments. The Debtor may be subject to higher taxes which would reduce the funds available to distribute to holders of Allowed Claims.   Further, the monetization of the Private Investments may take time to materialize and face a number of external risks with respect to each particular project and investment.

Additionally, the value of the Debtor's assets is subject to market volatility, which could negatively impact the cash available for distribution.   The Debtor owns certain cryptocurrency, which incurs all of the risk factors associated with this type of asset, including market volatility, loss of access, or theft.

***Tax Assumptions and Risks.***

***Debtor is projecting the amounts owed to the IRS and the FTB and the amounts of certain refunds due from the IRS and/or the FTB.  These projections are in part based on amendments and restatements of previously filed tax returns.  It is possible that the IRS or the FTB may take positions that differ from the assumptions on which the projections are based. If that is the case and the taxing authorities are successful in the positions that they take, the Debtor's assumptions with respect to the refunds due from, and amounts due to, the taxing authorities may be incorrect.***

Doc #  DC/19510608v1

# VI.

## CONFIRMATION OF THE PLAN

**A.    Voting Procedures and Solicitation of Votes**

The voting procedures and the procedures governing the solicitation of votes are described above in Article I.B (*Voting on the Plan*) and in the Disclosure Statement Order, which has been sent to you with this Disclosure Statement.

**B.    Confirmation Hearing**

The Confirmation Hearing and objection procedures are described above in Article I.C. (*Confirmation Hearing and Deadline for Objections to Confirmation)* and in the Disclosure Statement Order, which has been sent to you with this Disclosure Statement if you are entitled to vote on the Plan.

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.    General Requirements of Section 1129**

**1.    Requirements of Section 1129(a) of the Bankruptcy Code**

*a.    General Requirements*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means proscribed by law;

- Any payment made or promised by the Debtor under the Plan for services or for costs and expenses in, or in connection with, the chapter 11 case, or in connection with the Plan and incident to the chapter 11 case, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

- With respect to each class of claims, each holder of an impaired claim either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor was liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test," below;

- Each class of claims has either accepted the Plan or is unimpaired under the Plan;

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that Administrative Expense Claims and Priority Non-Tax Claims will be paid in full, in cash, on the Effective Date and that holders of Priority Tax Claims may receive on account of such claims deferred cash payments, over a period not exceeding five years after the Petition Date, of a value as of the Effective Date, equal to the Allowed amount of such claims with interest from the Effective Date;

- At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class;

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor of the Debtor under the Plan, unless such liquidation or reorganization is proposed in the Plan. See discussion of "Feasibility," below; and

- All fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

### b.    Best Interests Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an impaired claim either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The first step in meeting the best interests test is to determine the dollar amount that would be generated from the liquidation of Debtor's assets and properties if his case became a chapter 7 case. The total amount available would be the sum of the proceeds from a forced liquidation of his assets by a chapter 7 trustee plus cash on hand. The next step is to reduce that total by the amount of any claims secured by such assets (to the extent of the value of the collateral securing

such claims), the costs and expenses of the liquidation and such additional administrative expenses and priority claims that may result from the use of chapter 7 for the purposes of liquidation, including tax claims. Finally, the value of the resultant residual balance is allocated to creditors in the strict order of priority in accordance with section 726 of the Bankruptcy Code, which requires that no junior claim holder receive any distribution until all senior claim and interest holders are paid in full. The amounts so allocated can then be compared to the value of the property that is proposed to be distributed under the Plan on the Effective Date.

Attached hereto as **<u>Exhibit B</u>** and incorporated herein by reference is a liquidation analysis (the "Liquidation Analysis") prepared by the Debtor with the assistance of the Debtor's financial advisors and in reliance upon the valuation methodologies utilized by the Debtor's advisors. As reflected in the Liquidation Analysis, after consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to his creditors in a chapter 11 case, it is clear that confirmation of the Plan will provide each creditor with a recovery that is not less than it would receive pursuant to a liquidation under chapter 7 of the Bankruptcy Code because each creditor will be paid the full amount of their claim, with interest at the Applicable Interest Rate.

*c.     Feasibility of the Plan*

In connection with confirmation of the Plan, section 1129(a)(11) of the Bankruptcy Code requires that the Debtor demonstrate that confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor. This is the so-called feasibility test. For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed his ability to meet his obligations under the Plan.  Attached hereto as **<u>Exhibit C</u>** and incorporated herein by reference are financial projections ("Financial Projections") prepared by the Debtor with the assistance of the Debtor's financial advisors and in reliance upon the valuation methodologies utilized by the Debtor's advisors. As reflected in the Financial Projections, the Debtor believes that the Plan provides a feasible means of reorganization from which there is a reasonable expectation that, following the Confirmation Date, he will possess the resources to meet his obligations under the Plan.

Doc #  DC/19510608v1

**2.    Requirements of Section 1129(b) of the Bankruptcy Code**

Section 1129(b) of the Bankruptcy Code provides for confirmation (or "<u>cramdown</u>") of a plan of reorganization even if the plan is not accepted or deemed accepted by all impaired classes of claims, as long as at least one impaired class of claims has voted to accept the plan and certain other requirements are met.

If any impaired Class of Claims does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, at least one impaired Class has voted to accept the Plan and as to each Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown provisions set forth in section 1129(b) of the Bankruptcy Code.

*a.    No Unfair Discrimination*

The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a plan. The test does not require that the treatment be the same or equivalent, but that treatment be "fair." A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  Bankruptcy courts will take account for a number of factors in determining whether a plan discriminates unfairly. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  Thus, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class so long as the treatment is fair.

The Debtor submits that if the Debtor "crams down" the Plan pursuant to section 1129(b) of the Bankruptcy Code, the Plan is structured so that it does not "discriminate unfairly."  All Classes under the Plan are provided treatment that is substantially equivalent to the treatment that is provided to other Classes that have equal rank.

Doc #  DC/19510608v1

1

                    *a.*       *Fair and Equitable Test*

2

The "fair and equitable" test applies to classes of different priority and status (e.g.,

3

secured versus unsecured) and includes the general requirement that no class of claims receive

4

more than 100 percent of the amount of the allowed claims in the class. As to the dissenting class,

5

the test sets different standards depending upon the type of claims or equity interests in the class.

6

The following sets forth the "fair and equitable" test that must be satisfied as to each type of class

7

for a plan to be confirmed if such class rejects the Plan:

8

- Secured Creditors. Each holder of an impaired secured claim either (i) retains its

9

    liens on the property, to the extent of the allowed amount of its secured claim, and
    receives deferred cash payments having a value, as of the effective date of the

10

    plan, of at least the allowed amount of such secured claim, (ii) has the right to
    credit bid, subject to section 363(k) of the Bankruptcy Code, the amount of its

11

    claim if its property on which it has a lien is sold and retains its lien on the
    proceeds of the sale, or (iii) receives the "indubitable equivalent" of its allowed

12

    secured claim.

13

- Unsecured Creditors. Either (i) each holder of an impaired unsecured claim

14

    receives or retains under the plan, property of a value, as of the effective date of
    the plan, equal to the amount of its allowed claim or (ii) the holders of claims and

15

    interests that are junior to the claims of the dissenting class will not receive any
    property under the plan.

16

17

This test also requires that the plan comply with the so-called "absolute priority rule" and

18

that a creditor not be paid more than it is owed, including appropriate interest.  The "absolute

19

priority rule" requires that claims of a higher priority under the bankruptcy code be paid before

20

claims that are junior in priority.  The Debtor submits that the Plan is structured so that it satisfies

21

the "fair and equitable" requirement.   The Plan complies with the absolute priority rule because

22

Priority Tax Claims are being paid before Unsecured Claims.  The Plan also provides for the

23

payment in full, with Interest at the Applicable Interest Rate, of all Claims.  Holders of Secured

24

Claims retain their liens until they are paid in full satisfying the obligation as to Secured Claims.

25

Therefore, the Plan is "fair and equitable" as to each class of Claims.

26

27

28

**3.    b.    Confirmation of an Individual Chapter 11 Plan**

*a.    Section 1129(a)(15) of the Bankruptcy Code*

The Plan is an individual plan under chapter 11 of the Bankruptcy Code. Section 1123(a)(8) of the Bankruptcy Code requires that an individual chapter 11 plan "provide for the payment to creditors under the plan of all or such portion of earnings from personal services performed by the debtor after the commencement of the case or other future income of the debtor as is necessary for the execution of the plan." Further, section 1129(a)(15) of the Bankruptcy Code provides that if a creditor objects to confirmation of an individual chapter 11 plan, the plan may only be confirmed if:

> (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
>
> (B) the value of the property to be distributed under the plan is not less than the projected disposable income of the debtor (as defined in section 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15).[17]

---

[17] Section 1325(b)(2) provides:
> For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than payments made under Federal law relating to the national emergency declared by the President under the National Emergencies Act (50 U.S.C. 1601 et seq.) with respect to the coronavirus disease 2019 (COVID–19), child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended—
>> (A) (i)for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
>>> (ii)for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed 15 percent of gross income of the debtor for the year in which the contributions are made; and
>> (B)if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

Doc #  DC/19510608v1

As reflected in the Plan and Financial Projections, the Debtor is paying each creditor in full, with interest at the Applicable Interest Rate.  The Debtor believes that he is proposing to pay more than an equitable rate of interest to each creditor, which would at least meet or exceed any reasonable discount rate to use in calculating "...the value, as of the effective date of the plan, of the property to be distributed..." to such creditors, and so Section 1129(a)(15)(A) is satisfied.[18] Attached hereto as **Exhibit D** ("Disposable Income") is a projection of the Debtor's disposable income for the next seven (7) years.  As demonstrated by **Exhibit D** ("Disposable Income"), the Debtor projects that his disposable income for the next five (5) years will be approximately $988,000 and for the (7) years proposed under the Plan will be approximately $1.3 million.  The projected Plan Distributions are approximately $47.8 million.    Thus, the value of the property to be distributed to creditors under the Plan exceeds the value of the Debtor's projected disposable income by more than $46.4 million, thereby satisfying the requirements of section 1129(a)(15) of the Bankruptcy Code.

> b.    *Section 1141(d)(5)(A) of the Bankruptcy Code*

Section 1141(d)(5)(A) of the Bankruptcy Code states:

> (5) In a case in which the debtor is an individual—

> (A) unless after notice and a hearing the court orders otherwise for cause, confirmation of the plan does not discharge any debt provided for in the plan until the court grants a discharge on completion of all payments under the plan;

11 U.S.C. § 1141(d)(5)(A) (emphasis added).

As discussed in Article IV.M.1 above, the Debtor is seeking a discharge pursuant to section 1141(d)(5) of the Bankruptcy Code as of Final Payment Date.  To inform creditors of his request, the Debtor included the following conspicuous language in the Plan, Disclosure Statement, and Confirmation Hearing Notice:

> **PLEASE TAKE NOTICE THAT, PURSUANT TO ARTICLE 11.3 OF THE PLAN, THE DEBTOR SEEKS A DISCHARGE PURSUANT TO SECTION 1141(D)(5) OF THE BANKRUPTCY CODE AS OF THE DATE OF THE FINAL**

---

[18] Debtor will satisfy his plan obligations through various one-time asset sales and borrowings as otherwise described herein.

**PAYMENT DATE, WHICH WILL RESULT IN ALL CREDITORS BEING ENJOINED FROM TAKING ANY ACTION TO COLLECT, RECOVER OR OFFSET ANY CLAIM AS A PERSONAL LIABILITY OF THE DEBTOR.**

Upon completion of the payments contemplated under the Plan, which provides for payment in full of all Allowed Claims, the Debtor will satisfy the requirements for a discharge.[19]

## VII.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not confirmed, the following alternatives are available: (i) confirmation of another chapter 11 plan; (ii) conversion of the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or (iii) dismissal of the chapter 11 case leaving holders of claims to pursue available non-bankruptcy remedies. These alternatives will harm holders of claims.

If the Debtor, or any other party in interest (if the Debtor's exclusive period in which to file a plan has expired), could attempt to formulate a different plan, such a plan might involve either a reorganization of the Debtor or conversion of the chapter 11 case to a liquidation of the Debtor's assets under chapter 7. The Debtor's "Liquidation Analysis," which was prepared by the Debtor's financial advisor and is attached as **Exhibit B** to this Disclosure Statement**,** is an estimate of creditor recoveries under the Plan and under a hypothetical chapter 7 liquidation of the Debtor's assets. This analysis is based upon a number of significant assumptions that are described therein and does not purport to be a valuation of the Debtor's assets and is not necessarily indicative of the values that may be realized in an actual liquidation.

The Debtor has explored numerous alternatives in connection with the extensive process of formulating and developing the Plan. The Debtor has concluded that the Plan, as described in this Disclosure Statement, enables stakeholders to realize the most value under the circumstances. In considering a liquidation of his assets under chapter 7 of the Bankruptcy Code, the Debtor has accounted for the nature, status, and underlying values of his tangible and

---

[19] The Debtor reserves all rights to seek an early discharge under section 1141(d)(5)(B) of the Bankruptcy Code.

Doc # DC/19510608v1

intangible assets, the ultimate realizable value of such assets, and the extent to which certain of his assets are subject to the liens and security interests of secured creditors. The Debtor also has factored in the loss of the Plan Backstop between RJB and the Debtor in the absence of a Plan. The Debtor believes that liquidation under chapter 7 would result in materially lower or at least far more uncertain recoveries for creditors as demonstrated in **Exhibit B**. If the chapter 11 case is dismissed, holders of claims would be free to pursue non-bankruptcy remedies in their attempts to satisfy claims against the Debtor. The failure of plan confirmation and dismissal of the chapter 11 case would result in a race to the courthouse that could leave many creditors with no recovery at all. Accordingly, the Debtor believes that the Plan will enable all creditors to realize the greatest possible recovery on their respective claims with the least delay.

## VIII.

## CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain material U.S. federal income tax consequences of the Plan. This summary is based on the Internal Revenue Code, the Treasury Regulations promulgated thereunder (whether final, temporary, or proposed), administrative rulings, and judicial decisions, all as in effect on the date hereof. Each of the foregoing authorities is subject to change, which change could apply with retroactive effect and could affect the accuracy of the statements and conclusions set forth in this discussion. Debtor has not requested a ruling from the IRS as to the U.S. federal income tax consequences to Debtor or holders of claims. An opinion of counsel has not been obtained with respect to the tax aspects of the Plan. This summary is not binding on the IRS, and the IRS is not precluded from taking a position that is different from, and contrary to, the positions described in this summary.

This summary is for general information purposes only and does not purport to be a complete analysis or listing of all potential U.S. federal income tax considerations that may apply to a holder of a claim. This summary does not account for the individual facts and circumstances of any particular claim holder that may affect the U.S. federal income tax consequences to such

holder, including specific tax consequences to a holder under an applicable tax treaty. In addition, this summary does not address the U.S. federal alternative minimum, U.S. federal estate and gift, U.S. state and local, or non-U.S. tax consequences of any distributions.

**NO REPRESENTATIONS ARE MADE BY THIS DISCLOSURE STATEMENT REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST.**

**1.     Federal Income Tax Consequences to Holders of Claims**

A Holder of an Allowed Claim will generally recognize ordinary income to the extent that the amount of Cash or property received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtor or included in income by the Holder of the Allowed Claim. A Holder of an Allowed Claim will generally recognize gain or loss equal to the difference between the Holder's adjusted basis in its Claim and the amount realized by the Holder upon consummation of the Plan that is not attributable to accrued but unpaid interest. The amount realized will equal the sum of Cash and the fair market value of other consideration received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the Creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the Creditor's holding period of the Claim. If the Claim in the creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss. Such gain or loss will constitute long-term capital gain or loss if the creditor is a non-corporate taxpayer and held such Claim for longer than one year or short-term capital gain or loss if the Creditor held such Claim for less than one year.

A Holder of an Allowed Claim who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim may be entitled to a bad debt deduction if either: (i) the Holder is a corporation; or (ii) the Claim constituted (a) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (b) a debt the loss from the worthlessness of which is incurred in the Holder's trade or business. A Holder that has previously

79

recognized a loss or deduction in respect of its Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the Holder's adjusted basis in such Claim.

Holders of Claims who were not previously required to include any accrued but unpaid interest with respect to in their gross income on a Claim may be treated as receiving taxable interest income to the extent any consideration they receive under the Plan is allocable to such interest. Holders previously required to include in their gross income any accrued but unpaid interest on a Claim may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.

Holders of a Claim constituting any installment obligation for tax purposes may be required to currently recognize any gain remaining with respect to such obligation if, pursuant to the Plan, the obligation is considered to be satisfied at other than its face value, distributed, transmitted, sold or otherwise disposed of within the meaning of section 453B of the Tax Code.

**2.      Certain Tax Consequences to Debtor's Estate**

The <u>Estate</u> succeeds to the tax attributes of the Debtor, including but not limited to the Debtor's carryovers determined as of the first day of the Debtor's tax year in which the Chapter 11 Case commenced. Such carryovers include net operating losses, charitable contributions, capital losses, and credit carryovers, suspended losses, depreciation subject to recapture and other tax items (individually and collectively "<u>Tax Attributes</u>").

The method of accounting of the Estate must be the same as that of the Debtor. In this Chapter 11 Case the Estate will therefore utilize the cash basis method of accounting. The Estate's basis, holding period, and character of assets transferred by the Debtor to the Estate will remain the same as if they had remained in the hands of the Debtor. The transfer of the Debtor's assets to the Estate will not be treated as a disposition of those assets and such transfer should not have any tax consequence therefrom. A similar provision applies to the Estate's transfer of any remaining assets back to the Debtor upon the conclusion of the Plan.

The Estate is entitled to deduct its expenditures made with respect to ongoing business enterprises, and such deductions will retain the character of the deduction as if the Debtor had

made the expenditures itself. For example, a non-passive trade or business deduction characterized as such to the Debtor would retain such character in the Estate. The Estate is further entitled to certain itemized deductions that are typically allowed to an individual, including but not limited to investment expenses, real estate taxes and mortgage interest.

Administrative expenditures allowed under section 503 of title 11 of the United States Code, and any fee or charge assessed against the Estate under chapter 123 of title 28 of the United States Code, to the extent not disallowed under any other provision of this title, shall be allowed as a tax deduction to the Estate. Any excess administrative expenses incurred in a given year that would give rise to a net operating loss if IRC section 172(c) were applied without consideration to the modifications required by IRC section 172(d)(4), shall constitute an excess administrative loss. This excess administrative loss may be carried back three years and then carried forward four years to offset Estate taxable income. These administrative deductions are an estate level deduction and, therefore, may not be utilized by the Debtor upon conclusion of the Estate.

**3.    Importance of Obtaining Professional Tax Assistance**

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ASSOCIATED WITH THE PLAN ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S INDIVIDUAL CIRCUMSTANCES. ACCORDINGLY, HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL AND NON-U.S. INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

**IX.**

**CONCLUSION**

Debtor believes the Plan is in the best interests of all of his creditors and urges the holders of Claims to vote to accept the Plan, and to evidence such acceptance by returning their signed

Doc # DC/19510608v1

1    ballots so that they will be received by STEPTOE & JOHNSON LLP, 633 West Fifth Street. Los

2    Angeles, Suite 1900 California 90071, Attn:  Kerri Lyman; Joshua Taylor; Jeffrey Reisner, no

3    later than __:__ _.m. (Pacific time) on _____ __, 2021.

4

5    Dated: May 30, 2021.          Respectfully Submitted,

6

7

8                      Kfir Gavrieli
                          Debtor and Debtor in Possession

9                      _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Doc #  DC/19510608v1

**EXHIBITS INTENTIONALLY OMITTED**

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 633 West Fifth Street, Suite 1900, Los Angeles, CA  90071.

A true and correct copy of the foregoing document entitled (*specify* <u>SECOND AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S SECOND AMENDED PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE </u>will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On May 31, 2021, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

See attached service list

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) May 31, 2021, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) June 1, 2021, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

BY OVERNIGHT MAIL:
Honorable Sheri Bluebond
United States Bankruptcy Court
Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1534 / Courtroom 1539
Los Angeles, CA 90012

BY OVERNIGHT MAIL
Eryk R Escobar
Office of the United States Trustee
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017

BY OVERNIGHT MAIL:
Hogan Lovells US LLP
Attn: Rick Wynne & Edward McNeilly
1999 Ave of the Starts
Suite 1400
Los Angeles, CA 90067

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 05/31/2021 | Kerri A. Lyman | /s/ Kerri A. Lyman |
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**ECF LIST**

- William H Brownstein    Brownsteinlaw.bill@gmail.com
- Eryk R Escobar    eryk.r.escobar@usdoj.gov
- Peter Gilhuly    peter.gilhuly@lw.com
- William N Lobel    wlobel@tocounsel.com, jokeefe@tocounsel.com;sschuster@tocounsel.com
- Kerri A Lyman    klyman@steptoe.com, #-FirmPSDocketing@Steptoe.com;nmorneault@Steptoe.com;mhernandez@steptoe.com;aodonnell@steptoe.com
- Edward J McNeilly    edward.mcneilly@hoganlovells.com
- Amy Quartarolo    amy.quartarolo@lw.com, laura.pumerville@lw.com;amy-quartarolo-2972@ecf.pacerpro.com
- Jeffrey M. Reisner    jreisner@steptoe.com, #-FirmPSDocketing@Steptoe.com;klyman@steptoe.com;nmorneault@Steptoe.com
- Daniel S Schecter    daniel.schecter@lw.com
- Najah J Shariff    najah.shariff@usdoj.gov, USACAC.criminal@usdoj.gov
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Johnny White    JWhite@wrslawyers.com, aparisi@wrslawyers.com;eweiman@wrslawyers.com;chamilton@wrslawyers.com
- Richard Lee Wynne    richard.wynne@hoganlovells.com, tracy.southwell@hoganlovells.com;cindy.mitchell@hoganlovells.com;rick-wynne-7245@ecf.pacerpro.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**