CHRISTOPHER E. PRINCE (SBN 183553)
  cprince@lesnickprince.com
KAITLYN M. HUSAR (SBN 362737)
  khusar@lesnickprince.com
LESNICK PRINCE PAPPAS & ALVERSON LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
Telephone:    (213) 493-6496
Facsimile:    (213) 493-6596

Attorneys for Creditors
Dikla Unatin and Dean Unatin

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>KFIR GAVRIELI,<br><br>         Debtor. | Case No.  2:21-bk-10826-BB<br><br>Chapter 11<br><br>**UNATINS' REPLY IN SUPPORT OF MOTION TO ENFORCE PLAN TERMS REGARDING POST EFFECTIVE DATE TRUSTEE CONTROL OF LITIGATION AND TO REQUIRE THE TRUSTEE TO EMPLOY COUNSEL WITHOUT THE APPEARANCE OF AN IRRECONCILABLE CONFLICT**<br><br>_____<br><br>Hearing Information:<br>Date:    December 17, 2025<br>Time:    1:00 p.m.<br>Place:    Courtroom 1539<br>     255 E. Temple Street<br>     Los Angeles, CA 90012<br>     Or Remotely Via ZoomGov |

1

## I.      INTRODUCTION

As the Unatins were preparing their Motion regarding control of litigation, they were also investigating certain very concerning allegations regarding Debtor Kfir Gavrieli's conduct before and during this bankruptcy case. Specifically, it appears that: (1) Kfir was directing an ongoing sales tax evasion scheme at Gavrieli Brands, LLC (the "Company") which has created multi-million sales tax liability for the Company – exclusive of penalties and interest; and (2) Kfir used the Company to help Joseph Sanberg defraud investors in Sanberg's company Aspiration Partners in exchange for Sanberg agreeing to supply the Plan Backstop in Kfir's bankruptcy case.

As a professional courtesy, the Unatins' counsel contacted the PEDT's counsel to describe the results of their investigation before they brought the matter to the Court's attention. The PEDT's counsel stated that he would contact Kfir and his counsel to discuss the matter.

After speaking with Kfir and his counsel, the PEDT's counsel responded. In his response, he said nothing about the ongoing tax evasion scheme. Regarding Kfir's involvement with Sanberg, the PEDT's counsel confirmed the most critical fact of Kfir's involvement in Sanberg's scheme: Kfir, purporting to act on behalf of Gavrieli Brands, signed a letter of intent ("LOI") that stated Gavrieli Brands would purchase $350,000 per month in "enterprise sustainability services" (i.e., tree-planting) from Sanberg's company, Aspiration. The LOI between Gavrieli Brands (Kfir) and Aspiration (Sanberg) is dated January 1, 2021 – one month before Kfir filed his chapter 11 petition and proposed chapter 11 plan that included a $30 million unsecured and subordinated revolving credit agreement – the Plan Backstop – from Sanberg.

Kfir's admission that he signed the LOI, a KGI Advisors report prepared for the Creditors' Committee in this case regarding Kfir's multiple bizarre and unexplained financial transactions with Sanberg, a recently filed SEC Complaint against Sanberg regarding the Aspiration fraud, Sanberg's plea agreement regarding the same fraud and a Bloomberg

News article about problems at Aspiration, when read in combination and if accurate, suggest that Kfir was an active participant in Sanberg's fraud and that Kfir's participation was a quid pro quo for Sanberg's supplying the Plan Backstop.  In other words, it appears that Kfir's entire bankruptcy case was a fraud from its inception.

The Unatins are preparing two motions regarding these two issues (the ongoing sales tax evasion and the Plan Backstop fraud).  Given the relevance to the present motion and to give the PEDT an opportunity to further respond, the Unatins request that the hearing on the Motion regarding control of litigation and employment of counsel be continued.

If the Court chooses not to continue the Motion, the Unatins submit the following reply.

II.     **ARGUMENT**

      **A.     The PEDT Does Not Explain Why Sections 3.4 and 3.15 of the Trust Agreement are Not Subject to the Post-Default Provisions in Section 4.2 of the Trust Agreement.**

The PEDT's first argument is that Kfir remains in control of all Estate litigation to the exact same extent he did prior to the uncured Plan Default. Omnibus Reply, at pg. 24-25 of 30 ("The Plan Default Does to Reallocate Management of the Unatin Litigation").  The PEDT argues that "[u]nlike other provisions of the Trust Agreement, neither section 3.4 ["Litigation"] nor section 3.15 ["Privileged Documents"] are subject to Section 4.2 of the Trust Agreement [. . .].'" Omnibus Reply, at pg. 25 of 30.

The Unatins agree that prior to the Plan Default, subject to section 3.4 of the Trust Agreement, Kfir was given control of the Estate's interest in the Derivative Litigation and State Court Litigation. However, the PEDT's articulation of his current position that absolutely nothing has changed with respect to the Estate's interest in the Derivative Litigation and State Court Litigation is at odds with the entire construction of the Trust post-Default. With the Plan Backstop worthless and the Plan in Default, it makes no sense that Kfir remain in complete control of Estate's interest in the litigation. It is concerning to all creditors if all provisions of section 3.4 of the Trust Agreement, including that "[t]he Trust

shall pay litigation costs for the Unatin Litigation and any appeals thereof, and such payments will be expenses of the Estate, not distributions to Debtor" are unaffected after the Plan Default and where there exists no Plan Backstop whatsoever. This is an insolvent Estate, and it stretches credulity that the Debtor remains in complete and absolute control of litigation, fully funded by the Estate.

Instead, the post-Default provisions of section 4.2 of the Trust Agreement, which allocate authority exclusively to the Trustee regarding Estate Assets post-Default, are best read as a constraint on the Debtor's alleged right to advance his personal desire to wage his self-described "nuclear war" on the Unatins.

**B.    The PEDT States that Kfir Is Not A Hueston Hennigan Client Even Though Kfir Supposedly Manages And Controls The Litigation Where Hueston Hennigan Is Counsel Of Record.**

Although the PEDT's initial argument is that Kfir remains in control of the Derivative Litigation and State Court Litigation, he also states that "Kfir Gavrieli is not a current client of Hueston Hennigan and has not been for many years." Omnibus Reply at pg. 25 of 30. This argument gets to the heart of what is so concerning: the PEDT maintains that Kfir is not Hueston Hennigan's client, but the PEDT also maintains that section 3.4 of the Trust Agreement gives Kfir exclusive decision-making authority in the Unatin Litigation. Namely,

> [The] Debtor, on behalf of the Trustee as the representative of the Trust, shall ***manage and control*** on behalf of the Trust any and all direct or indirect pending or threatened or potential claims between the Trust, Estate and/or the Debtor (and any agents and professionals thereof) and the Unatins (other than the Equitable Subordination Litigation), including the defense of claims brought in the Adversary Proceeding and the State Court Litigation, any other claims relating to the Adversary Proceeding and the State Court Litigation (whether by way of counterclaim or separate

claim, such as for indemnification against the Company), and any

appeals thereof (all such claims collectively "Unatin Litigation").

[Trust Agreement, Dkt. No. 829, ¶ 3.4 at p. 92 of 114.]

This circle cannot be squared. A person who manages and controls litigation is either a client or, at a minimum, an agent of a client (e.g., in-house counsel). Indeed, if Kfir manages and controls the litigation, given that Kfir's mother (Mira Gavrieli) is apparently funding Hueston Hennigan's professional fees, it strains credulity to say that Kfir is not Hueston Hennigan's client.

Again, the issue before the Court is not purely an issue of professional ethics. Instead, the critical issue is whether the PEDT's interests diverge from Kfir's such that Hueston Hennigan's dual representation can be maintained post-Default.

### C. The Unatins' Motion is Not a Collateral Attack on the Court's Prior Orders, and the Argument Was Not Previously Waived.

As outlined in the Unatins' Motion, the Unatins are aware of and have closely studied the Court's prior retention Orders. *See* Motion at Dkt. No. 989 at pg. 14-15 of 24. The Unatins are not arguing that Hueston Hennigan cannot represent the PEDT pre-Default. Pre-Default, the expectation was that Kfir's spending on professional fees did not matter because the Plan Backstop would supply all necessary funds to pay both professional fees and creditors' claims.

Post-Default, however, that basic premise has fallen away. The current conflict issues are new and continue to evolve as the parties learn more information related to the Plan Backstop.

The Unatins do not argue that, under section 3.7 of the Trust Agreement, the PEDT cannot retain professionals that were previously employed by the Chapter 11 Trustee, the Committee, or the Debtor. However, this general proviso, i.e., that prior representation does not *per se* prohibit the current representation, does not give the PEDT blanket and unfettered discretion to retain any professional regardless of the circumstances or consequences.

Indeed, such a construction is contrary to basic public policy. For example, and for obvious reasons, the Trust Agreement could not allow the PEDT to retain a law firm to investigate a potential malpractice claim against itself.

While the PEDT asserts that the Unatins' "challenge to Hueston Hennigan is now barred by res judicata" [Omnibus Response, at pg. 27 of 30], he does so without conducting a full analysis of the relevant factors to establish res judicata. The *Trulis* case cited by the PEDT addressed the issue of res judicata in the context of a confirmed chapter 11 plan that contained an approved third-party release of certain directors of the debtor. *Trulis v. Barton*, 107 F.3d 685, 689 (9th Cir. 1995). Despite an unambiguous plan provision releasing plaintiff's claims, the law firm representing various plaintiffs refused to dismiss a lawsuit against the released parties in direct violation of an unambiguous term in the plan. *Id.* at 691. The facts in *Trulis* could not be more different than the facts underlying the Unatins' Motion in this case. First, the confirmed Plan in this case is not an order approving the PEDT's chosen professionals. Contrary to this suggestion, the Plan provides that:

> On the Effective Date, any requirement that the Trustee or Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate [. . .].

[Plan, Dkt. No. 829, ¶ 2.2(c), p. 24 of 114.] In this case, the PEDT decided, after confirmation of the Plan, to retain Hueston Hennigan. Court approval of the retention of Hueston Hennigan by the PEDT was not required. *Res judicata* is simply not implicated here.

For res judicata to apply, the following four elements must be satisfied: (1) a final judgment on the merits; (2) the judgment was rendered by a court of competent jurisdiction; (3) a second action involving the same parties; and (4) the same cause of action is involved in both cases. *In re Heritage Hotel Partnership I,* 160 B.R. 374, 376–77 (9th Cir. BAP 1993), *aff'd,* 59 F.3d 175 (9th Cir. 1995). Here, neither the first nor the fourth elements of res judicata are implicated in any way, and this doctrine does not apply. Instead, the Unatins

have brought their Motion after an unanticipated Plan Default and other ongoing concerns regarding the diverging interests of Kfir and the PEDT.

### D. Kfir's Involvement In Two Separate And Unrelated Criminal Activities Further Highlight The Conflict Issues Surrounding Heuston Hennigan.

#### 1. Kfir Is Causing Gavrieli Brands To Evade State Sales Tax.

The Unatins have complained about Kfir's stewardship of the Company. It is apparent that, under Kfir's unlawful sole control, Gavrieli Brands, LLC (the "Company") is not collecting or remitting state sales taxes as required by law after the Supreme Court decision in *South Dakota v. Wayfair, Inc.*, 585 U.S. 162 (2018). The Unatins have repeatedly asked that the PEDT take steps to deal with Kfir's mismanagement and the *Wayfair* problem. Unfortunately, financials provided to the Unatins in October 2025 indicate that nothing has been done to remediate the problem with one ironic exception: a review of the Company's website and bank statements indicates that the State of Wisconsin may have levied on the Company's bank accounts, which in turn forced the Company to recently begin collecting sales taxes for Wisconsin.

The *Wayfair* issue is particularly devastating to the Company because Kfir has overseen a precipitous decline in the Company's financial position. In 2017, the Company generated over $50 million in sales, fully half of which was net profit. By contrast, for tax year 2023 Kfir reported the Company's first-ever loss, $1.65 million, and the Company's recently released 2024 financials revealed a $4.6 million loss on just $11 million in sales – a massive and devastating swing from when the Unatins operated it. The Company's decline under Kfir is also reflected in its bank balance. At the end of 2020 (a month before Kfir filed his Chapter 11 petition), the Company had approximately $20 million sitting in cash. Now, it is believed to be just a fraction of that, and there are concerns that the *Wayfair* liability Kfir is intentionally

generating may exceed all the Company's cash.

Given the Plan default, the Unatins ask that the PEDT be compelled to report to the Unatins and the Court regarding the nature and extent of the Company's *Wayfair* liability, including Kfir's role in creating that liability, and that the PEDT further be required to cooperate with Unatins to remediate that default. Failure to act may result in the complete collapse of the Company, depriving the Trust and creditors of one of the Estate's most valuable assets.

The extent and nature of the *Wayfair* issue further highlight the conflict between Hueston Hennigan's representation of Kfir and the PEDT. Kfir's misconduct as manager of the Company is the entire point of the Derivative Litigation. Hueston Hennigan either knows about the *Wayfair* problem or Kfir has been concealing it from Hueston Hennigan. Either way, Hueston Hennigan is obligated to cooperate with the PEDT, its purported client, to determine the nature and extent of Kfir's involvement in creating the massive sales tax liability.

### 2. Kfir Likely Conspired With Joseph Sanberg To Defraud Investors In Aspiration Partners In Exchange For Sanberg Supplying Kfir With A Plan Backstop That Was Destined To Collapse.

A few days after the Petition Date, Kfir filed his proposed chapter 11 plan. The proposed plan was built around a so-called "Plan Backstop" – a $30 million revolving credit facility from RJB Partners. RJB Partners was an entity controlled by Kfir's close friend, Joseph Sanberg. Sanberg also personally guaranteed the Plan Backstop.

Ultimately, the Plan Backstop was expanded to over $35 million, and it became the foundation for the confirmed chapter 11 Plan. Kfir and the Creditors' Committee both supported the plan, which was ultimately confirmed over the Unatins' objections. As the chapter 11 Trustee's disclosure statement stated, "[t]he unconditional Plan Backstop is the

single most important component of the Plan." [Disclosure Statement, Dkt. No. 622, p. 68 of 217.]

However, Joseph Sanberg and the Plan Backstop were a fraud. Sanberg recently pleaded guilty to multiple massive financial frauds regarding Aspiration. [Plea Agreement, USA v. Sanberg, C.D. Cal. Case No. 2:25-cr-00200-SVW, Dkt. No. 43.] Aspiration's and RJB Partners' assets have been liquidated, and the Plan Backstop and Sanberg's personal guarantee are now worthless. An admission by Kfir to the PEDT's counsel, a recently filed SEC Complaint, Sanberg's Plea Agreement, a Bloomberg News article, and a KGI Advisors report prepared for the Creditors' Committee, taken together, suggest that Kfir was directly involved in Sanberg's fraud, and the Plan Backstop was fraudulent from the outset.

The centerpiece of the SEC Complaint is that Sanberg inflated revenue numbers at his company, Aspiration Partners. [Complaint, SEC v. Sanberg, C.D. Cal. Case No. 8:25-cv-01848, Dkt. No. 1.] Sanberg acknowledged this fraud in his criminal plea agreement, and the SEC Complaint provides additional details about how his fraud operated.

According to the SEC Complaint, Sanberg and various individuals and entities executed letters of intent (LOIs) to purchase carbon offsets from Aspiration in the form of reforesting services (i.e., tree-planting).  Aspiration then recognized the amounts listed on the LOIs as revenue.  According to the SEC, LOI Customer revenue represented a major portion of Aspiration Partners' recognized revenue:

> Specifically, for fiscal year 2021, LOI Customer revenue
> accounted for approximately $44 million of Aspiration's $100.6
> million in recognized revenue. Aspiration recognized this
> approximate $44 million in LOI Customer revenue, even though

approximately $[34] million remained uncollected as of

December 31, 2021"

SEC Complaint, p. 10 of 23:

According to the SEC Complaint, the LOI Customers were not bona fide customers, and the LOIs were not genuine contracts. (*Id.* at p. 6 of 23.) Instead, LOIs were sham "round trip" transactions. Sanberg and the LOI Customers agreed that the LOI Customers were not required to pay the amounts on the LOIs. (*Id.*) Sanberg told the LOI Customers that he would pay Aspiration directly or would give the LOI Customers money that they would use to pay Aspiration. (*Id.*)

The SEC Complaint states that Sanberg began recruiting LOI Customers in and around December 2020, and most of the LOIs have effective dates in January, February and March 2021. (*Id.* at pp. 6-7 of 23.) In other words, the LOI investment fraud activities commenced right at the time that Kfir realized he was going to have a large judgment entered against him, had engaged bankruptcy counsel and was arranging for Sanberg to provide the Plan Backstop that was the centerpiece of his bankruptcy strategy.

That timing is not a coincidence. The SEC Complaint includes a list of LOI Customers, identified only by initials. (*Id.* at pp. 7-8 of 23.) One of the LOI Customers is listed as "G.B." Another one of the LOI Customers is listed as "G.P.M.S." The Unatins suspect that "G.B." refers to Gavrieli Brands and that Kfir executed the LOI on the company's behalf. **Indeed, Kfir has now admitted to the PEDT's counsel that he executed the LOI.**

The Unatins also suspect that "G.P.M.S." refers to Gavrieli Plastics Metals and Sign Supplies, Kfir's father's business (the Unatins suspect that the LOI was executed by Kfir or at his direction without his father's knowledge).

According to press reports, Sanberg used a particular one of his business entities – Apogee Pacific LLC – to facilitate these fraudulent round-trip transactions.  This further suggests that Kfir was deeply involved in Sanberg's fraudulent LOI scheme.  In the months leading up to the bankruptcy filing and Plan Backstop proposal, Kfir and Sanberg were involved in a series of multimillion dollar transactions where money effectively passed back and forth between them – often using Apogee Pacific.

- On June 7, 2019, Kfir wired $5 million to Sanberg's Apogee Pacific, purportedly as a loan (though the loan was not documented until the day before filed for bankruptcy).

- Between February and July 2020, Sanberg paid $1.8 million to Kfir's professionals, largely to Hueston Hennigan.

- On December 16, 2020, Kfir wired $500,000 to Sanberg's RJB Partners (the entity they used for the Plan Backstop).

- On December 21, 2020, Kfir wired an additional $2.5 million to Sanberg's Apogee Pacific, also purportedly as a loan.

- On December 23, 2020, Kfir wired nearly $2 million to Sanberg's RJB Partners.

- On January 29, 2021, Sanberg's Apogee Pacific paid $250,000 directly to Hueston Hennigan.

(KGI Report (attached to Creditors' Committee Opposition to OSC), Dkt. No. 284, pp. 62-80 of 162.)

While these transactions between Kfir and Sanberg were taking place and while Kfir's chapter 11 case was proceeding, Sanberg was using the fraudulent LOIs to obtain staggering financial benefits.  According to the SEC Complaint, in 2021 and 2022, Sanberg received more than $11.6 million in cash from Aspiration on account of the LOIs.  (SEC Complaint, p. 15 of 23.)  The SEC Complaint also states that, from March 2020 to November 2021, Sanberg obtained more than $100 million in loans by pledging Aspiration stock as collateral. (*Id.*, p. 5 of 23.)

If the information in the SEC Complaint, Sanberg's Plea Agreement and the Bloomberg News article are correct, taken together with the facts in the KGI report, (1) Kfir was likely directly and deeply involved in Sanberg's Aspiration fraud;  (2) Kfir's involvement in the Aspiration fraud was likely a quid pro quo for the Plan Backstop; and (3) Kfir likely knew from the outset of this bankruptcy case that the Plan Backstop could collapse at any time.

The implications of Kfir's involvement in Sanberg's fraud are staggering.  Kfir would obviously know that the Plan Backstop could and would fail whenever the fraud was revealed.  His conduct throughout the bankruptcy case and, in particular, his conduct of the Derivative Litigation and Subordination Action are called into question.  The PEDT must investigate Kfir's conduct (and/or cooperate with the Unatins to investigate it), but the PEDT cannot possibly conduct an impartial investigation while simultaneously using Kfir's lawyers.

## III.    CONCLUSION

For the reasons set forth above, the Unatins respectfully request that the Court enter an order requiring the PEDT to exercise sole control over the Derivative Action and State Court Litigation and requiring the PEDT to retain legal counsel without the appearance of an irreconcilable conflict.

DATED: December 15, 2025        LESNICK PRINCE PAPPAS & ALVERSON LLP

By: /s/ Christopher E. Prince
Christopher E. Prince
Counsel for Creditors Dikla Unatin and Dean Unatin

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: Lesnick Prince Pappas & Alverson LLP, 315 W. 9th Street, Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled **UNATINS' REPLY IN SUPPORT OF MOTION TO ENFORCE PLAN TERMS REGARDING POST EFFECTIVE DATE TRUSTEE CONTROL OF LITIGATION AND TO REQUIRE THE TRUSTEE TO EMPLOY COUNSEL WITHOUT THE APPEARANCE OF AN IRRECONCILABLE CONFLICT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1**. <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) <u>12/15/2025</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **William H Brownstein**     Brownsteinlaw.bill@gmail.com
- **Amir Gamliel**     agamliel@perkinscoie.com, cmallahi@perkinscoie.com; DocketLA@perkinscoie.com
- **Kaitlyn M. Husar**     khusar@lesnickprince.com, jmack@lesnickprince.com
- **Gregory K Jones**     gjones@stradlinglaw.com, smjohnson@sycr.com; smjohnson@stradlinglaw.com
- **Tobias S Keller**     tkeller@kellerbenvenutti.com
- **Robert Allan Kors** (TR)     robertkorstrustee@gmail.com
- **Jordan A Kroop**     jkroop@pszjlaw.com, rleibowitz@perkinscoie.com
- **Allison L Libeu**     alibeu@hueston.com, sjones@hueston.com
- **William N Lobel**     wlobel@tocounsel.com, mmason@tocounsel.com
- **Kerri A Lyman**     klyman@steptoe.com, #-FirmPSDocketing@Steptoe.com ; nmorneault@Steptoe.com; mhernandez@steptoe.com; aodonnell@steptoe.com
- **Edward J McNeilly**     edward.mcneilly@hoganlovells.com, kristel.gelera@hoganlovells.com
- **Christopher E Prince**     cprince@lesnickprince.com, jmack@lesnickprince.com; cprince@ecf.courtdrive.com; jnavarro@lesnickprince.com
- **Jeffrey M. Reisner**     jreisner@steptoe.com, #-FirmPSDocketing@Steptoe.com; klyman@steptoe.com; nmorneault@Steptoe.com
- **William Schumacher**     wschumacher@winthrop.com, autodocketecf@milbank.com
- **Najah J Shariff**     najah.shariff@usdoj.gov, caseview.ecf@usdoj.gov;usacac.tax@usdoj.gov
- **David Samuel Shevitz**     David.S.Shevitz@usdoj.gov
- **Mark Shinderman**     mshinderman@milbank.com, dmuhrez@milbank.com;dlbatie@milbank.com
- **Dara L Silveira**     dsilveira@kbkllp.com, cmitsuoka@kbkllp.com
- **Mohammad Tehrani**     mtehrani@milbank.com, aromain@milbank.com; bnicholson@milbank.com; cbrennand@milbank.com
- **United States Trustee (LA)**     ustpregion16.la.ecf@usdoj.gov
- **Johnny White**     JWhite@wrslawyers.com, jlee@wrslawyers.com
- **Richard Lee Wynne**     richard.wynne@hoganlovells.com, tracy.southwell@hoganlovells.com; cindy.mitchell@hoganlovells.com;rick-wynne-7245@ecf.pacerpro.com

☐ Service information continued on attached page

**2.** <u>**SERVED BY UNITED STATES MAIL**</u>:
On <u>12/15/2025</u>, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

- **Kfir Gavrieli**
  11771 Montana Ave. #215

Los Angeles, CA 90049

- **Kfir Gavrieli**
  1171 Montana Avenue #215
  Los Angeles, CA 90049

☐ Service information continued on attached page

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 12/15/2025 | Christopher Prince | /s/ Christopher Prince |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |